John E. RENNIE, Plaintiff,

Caroline Mauger, Eugenio Burgeos, Leon Rossi, Hazel Moncrief, Ernie Welker, Mary Jane Weiss, Margaret Mary McGrath, Joseph Kamienski, Intervenors, on behalf of themselves and all others similarly situated,

v.

Ann KLEIN, Commissioner, Department of Human Services, Michail Rotov, M.D., Director of the Division of Mental Health and Hospitals, Max Pepernick, M.D., Acting Medical Director at Ancora Psychiatric Hospital, Robert Wallis, Chief Executive Officer at Ancora Psychiatric Hospital, Engracio Balita, Consuelo Santos, Victor Ivanov, Gerald Abraham, Assistant Medical Directors at Ancora Psychiatric Hospital, Defendants.

Civ. A. No. 77–2624.

United States District Court, D. New Jersey.

Sept. 14, 1979.

Stanley C. Van Ness, Public Advocate, by Sheldon Gelman, Asst. Deputy Public Advocate, Trenton, N. J., for plaintiff and intervenors.

John J. Degnan, Atty. Gen. of New Jersey, by Steven Wallach, Deputy Atty. Gen., Dept. of Law and Public Safety Human Services and Corrections Section, Trenton, N. J., for defendants.

## OPINION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BROTMAN, District Judge.

This is a motion for a preliminary injunction by a class composed of patients in five hospitals for the mentally ill operated by the State of New Jersey. Plaintiffs seek to restrain the hospitals and their staffs from forcibly administering drugs to them unless a hearing is held and certain conditions are met. The court holds that plaintiffs do have a constitutional right to refuse medication in certain circumstances, and has fashioned a decree to enforce that right.

## PROCEDURAL HISTORY

This litigation began when a complaint was filed by plaintiff John E. Rennie on December 22, 1977. The defendants were Ms. Ann Klein, Commissioner of the Department of Human Services of the State of New Jersey, Dr. Michail Rotov, Director of the Department's Division of Mental Health and Hospitals, and various officials at Ancora Psychiatric Hospital, where Mr. Rennie is an involuntarily committed patient. The complaint charged defendants with violations of four rights: (1) the right to refuse medication in non-emergent circumstances, (2) the right to treatment, (3) the right of access to counsel, and (4) the right to be free from physical abuse while in custody.

Since the complaint was filed, the litigation has focused on the right to refuse treatment, and, tangentially, on the right to counsel, while the rights to adequate treatment, safe confinement, and access to counsel generally have been reserved for later consideration. On December 20, 1978, the court imposed a temporary restraining order on defendants preventing them from medicating Mr. Rennie against his will beyond a maintenance dosage except in emergencies. Plaintiff then moved for a preliminary injunction and the court held fourteen days of hearings between January 13 and April 28, 1978. On April 18, 1978, the temporary restraining order was dissolved after a consensus was reached concerning the proper treatment for Mr. Rennie at that time. However, on May 19 the plaintiff again sought temporary relief, which was denied pending a resolution of the preliminary injunction motion.

The court issued its decision on November 9, 1978. The opinion, reported at 462 F.Supp. 1131, provides a detailed chronicle of Mr. Rennie's medical history and the litigation up to that time. It also discusses the beneficial and detrimental effects of various medications and the several legal theories asserted by plaintiff to support a right to refuse treatment.

This court concluded that a right to refuse should be recognized, based on the constitutional right of privacy. 462 F.Supp. at 1144–45. However, because of countervailing state interests, the right must be a qualified one, and the following four factors must be considered in applying the right in a given situation: (1) the patient's physical threat to other patients and staff at the institution, (2) the patient's capacity to decide on his particular treatment, (3) the existence of any less restrictive treatments, and (4) the risk of permanent side effects from the proposed treatment. *Id.* at 1145–48.

This court also stated that a mental patient has a right to procedural due process, and noted in dictum that this might include a hearing and representation by a lawyer and independent psychiatrist before drugs are forcibly administered in a non-emergent situation. *Id.* at 1147–48.

It was held that, because of the extended court hearings, Mr. Rennie had received all the process which he was due. *Id.* at 1147. It was also noted that Mr. Rennie was not receiving undesired medication; therefore no injunction was issued. *Id.* at 1148 & n. 6. However, Mr. Rennie's condition worsened shortly after that time and the hospital again sought to administer thorazine against the patient's will. After a hearing on December 7, 1978, the court denied Mr. Rennie's renewed motion for a preliminary injunction. In an opinion issued December 12, the court found that Mr. Rennie's capacity was severely limited at that time and that thorazine was the least restrictive means of stabilizing his condition. Therefore, the four factors indicated that an injunction should not issue. 462 F.Supp. 1151, 1153.[1]

At this time plaintiff moved to enlarge his suit to a class action. By order dated March 20, 1979, the court allowed plaintiff

---

1. After an initial regimen on the unwanted drug, thorazine, Mr. Rennie's condition again stabilized and has been generally good to date. At the present time he is voluntarily taking lithium carbonate and has been granted extended furloughs from the hospital. However, he still retains the status of an involuntary patient.

to amend his complaint to add class action allegations, allowed various intervenors to join the action as plaintiffs and conditionally certified three subclasses pursuant to Fed.R.Civ.P. 23(b)(2). The first subclass is composed of all persons who presently are or in the future may be hospitalized at Ancora Psychiatric Hospital. This subclass, according to the amended complaint, alleged violation of the rights to adequate treatment and safe confinement. The court has not yet been asked to hear the claims of this group.

The court also conditionally certified two statewide subclasses asserting the right to refuse treatment and to due process before treatment is forcibly administered. The amended complaint focused exclusively on the forcible administration of medication. See ¶ 13A. One subclass is composed of all adult patients involuntarily committed to five mental health facilities operated by the Division of Mental Health and Hospitals. The other subclass is composed of voluntarily committed adult patients at the five facilities: Ancora Psychiatric Hospital, Marlboro Psychiatric Hospital, Trenton Psychiatric Hospital, Greystone Park Psychiatric Hospital, and the Glen Gardner Center for Geriatrics.[2]

After extensive discovery, these two subclasses moved for a preliminary injunction to restrain the use of psychoactive drugs without the freely given consent of the patient and without procedural safeguards. The court held 17 days of hearings between June 13 and August 9, 1979. Transcripts (Tr.) XVII–XXXIII. The parties also supplemented the record with numerous depositions and exhibits.

The court heard testimony of several patients and staff personnel from the various facilities and was provided extensive medical records. Both sides produced highly qualified experts in psychiatry, psychopharmacology and hospital administration. Numerous scholarly articles were submitted. Courtroom or deposition testimony was provided by each of the five medical directors, who are the chief psychiatrists at the hospitals and supervise medical practices. This testimony was supplemented by memoranda, records and statistical studies concerning the use of medication at the facilities. A Division attorney who has addressed these issues also testified at length.

The following are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. Benefits and Side Effects of Psychotropic Medication

The benefits and side effects of psychotropic drugs were discussed in Part IV of the findings of fact in the November opinion. 402 F.Supp. 1136–38. Those findings are adopted and incorporated here. The court found that while psychotropic drug treatment had shown considerable success, recent studies had raised questions about the efficacy of using psychotropics in every case of mental illness. The present record provides additional evidence that many patients who would normally be treated with psychotropics can improve without them, and that smaller doses than are traditionally given can often be effective. Tr. XVII, 50–51; Tr. XXIV, 39; Tr. XXIX, 65; Crane, *Clinical Psychopharmacology in Its 20th Year*, 181 Science 124 (1973) (Exhibit P–46); Gardos & Cole, *Maintenance Antipsychotic Therapy: Is the Cure Worse than the Disease?* 133 Am. J. Psychiatry 32 (1976) (Ex. P–46). The drugs are most useful in diffusing schizophrenic thought patterns during acute psychotic episodes. Tr. XVI, 106–09; Tr. XXVI, 36; Tr. XIX, 58–59; Tr. XXVII, 31–32.

---

**2.** The statewide subclasses originally included minor as well as adult patients at the five hospitals and a sixth facility exclusively for children, the Arthur Brisbane Child Treatment Center. However, by a bench opinion on August 22, the court recertified the subclasses, creating two distinct statewide subclasses for voluntary and involuntary patients under the age of 18. The court also denied the preliminary injunction for these patients, concluding that plaintiffs, who had focused almost exclusively on the problems of adult patients during the hearings, had not provided adequate proof concerning the treatment of minors and the role of parents and guardians in determining minor patients' right to refuse.

The evidence at the recent hearings also reconfirmed the fact that these drugs have *dangerous* side effects, including tardive dyskinesia. Tr. XIX, 41; Tr. XXI, 47; Tr. XXVI, 40–50. Testimony also indicated that the drugs inhibit a patient's ability to learn social skills needed to fully recover from psychosis, and might even cause cancer. Tr. XXVI, 41, 48. Even acutely disturbed patients might have good reason to refuse these drugs. Tr. XXXI, 66.

## II. *The Hospitals*

### A. Patient Population and Staffing

Ancora Psychiatric Hospital is a state facility for the mentally ill in Hammonton, New Jersey. It houses about 1000 patients at any one time. Tr. XXII, 37; Ex. P–42, p. 1. Marlboro Psychiatric Hospital is a state facility in Marlboro, New Jersey, with a patient population of approximately 800. Ex. P–42, p. 1. Greystone Park Psychiatric Hospital, in Morris Plains, New Jersey, has a population of 1100. Tr. XXXI, 90; Ex. P–42, p. 1. Trenton Psychiatric Hospital in Trenton has about 1000 patients. *Ibid.* The Glen Gardner Geriatric Center in Glen Gardner, New Jersey, has about 140 patients; all are of advanced age and have been transferred from Trenton Psychiatric Hospital.

The four large hospitals have fairly similar populations. The majority of patients in each hospital are diagnosed schizophrenic; about 25 percent are categorized as having organic brain syndrome. About five percent are diagnosed as suffering major affective disorders, and another five percent are believed to be mentally retarded. Ex. P–42, pp. 35–42. The patients at Gardner are no longer in need of acute psychiatric care, but were formerly hospitalized for mental illness and often continue to receive psychotropic medication. Ex. J–6, pp. 3–5.

The hospitals are understaffed and patients have trouble seeing psychiatrists. Tr. V, 61–63; Tr. XXII, 7, 136. They generally have large, bleak and unpleasant wards, and the patients have little structured activity. Tr. I, 46–47; Tr. XIV, 165–67; Tr. XXVI, 18–20.

### B. Use and Effect of Psychotropic Drugs

A vast majority of patients at the five hospitals receive psychotropic medications, either by pills or injection. Tr. XXII, 54–55; Ex. D–23, p. 74; Ex. J–6, p. 36. One expert testified that drugs are the "be all and end all" at the hospitals. Tr. XXXI, 165. The medical director of Marlboro states in an office memorandum that the hospital "uses medication as a form of control and as a substitute for treatment." Ex. P–47, p. 15. A 1975 study of these institutions found overuse of drugs and inadequate record-keeping. Ex. P–47, pp. 84–86. The pattern of drug usage appears to be no different than that of other large state institutions, which was described in an article by Dr. George Crane, a psychiatrist who testified at the hearings:

> Many physicians, nurses, guardians, and family members who resent the patient's behavior and are threatened by potential acts of violence fail to distinguish between manifestations of illness and reactions to frustrations. Hence, drugs are prescribed to solve all types of management problems, and failure to achieve the desired results causes an escalation of dosage, changes of drugs, and polypharmacy. It is often reported that patients refuse to ingest their pills or that relatives fail to supervise the proper administration of medicines. Less publicized is the patient's dependence on drugs. The medical staff gains a feeling of accomplishment from the patient's adherence to a prescribed regime, while the nursing personnel and relatives, who are in more direct contact with the patient, derive a spurious feeling of security when the doctor's orders are carried out. Thus, the prescribing of drugs has in many cases become a ritual in which patients, family members, and physicians participate. . . . [N]euroleptics are often used for solving psychological, social, administrative, and other nonmedical problems.

Crane, *supra*, at 125.

This extensive use of psychotropics has caused numerous patients not only tran-

sient side effects, Tr. XXII, 134, but permanent neurological damage including tardive dyskinesia[3] and drug-induced parkinsonism. The medical director of the Gardner Geriatric Center estimated that 35 to 50 percent of his patients—all transferred from Trenton Hospital wards—have tardive dyskinesia. Ex. J–6, pp. 3–4. The medical director of Ancora testified that the rate of tardive dyskinesia among his patients was probably between 25 to 40 percent, based on national studies, although he could not estimate from data generated at his own hospital. Ex. P–29, p. 3; Tr. XXII, 82. In fact, none of the medical directors had a clear idea of the extent of tardive dyskinesia among their patients. Tr. XXXII, 33; Ex. D–23, p. 28; Ex. J–6, p. 4; Ex. J–7, p. 46. Dr. Crane, a leading expert in the study of tardive dyskinesia, examined patients at two of the hospitals and found significant number of persons with tardive dyskinesia and other potentially permanent side effects which had not been diagnosed and charted in the patients' records. Tr. XVII, 25–38.

Despite much criticism from outsiders, little was done by defendants to improve medication procedures until November 1978. At that time Commissioner Klein issued Administrative Order 2:13, Ex. D–21, and Dr. Rotov issued accompanying Administrative Bulletin 78–6, Ex. D–21. These documents provide specific guidelines to insure careful and knowledgeable administration of psychotropic drugs, and mandate that extrapyramidal symptoms be closely monitored. In particular, a check list for abnormal involuntary movement syndromes, or AIMS form, must be completed every three months. Ex. D–31. The court finds that these guidelines, modeled closely after a document used by the Michigan Department of Mental Health, Ex. P–47, pp. 48–52, are well intentioned and reflect a reasoned approach to the use of psychotropic medication.

However, plaintiffs have demonstrated a widespread failure to have the guidelines implemented. For instance, while AIMS forms have been completed for most patients in the five facilities, Tr. XVII, 79; Tr. XXVI, 14; Tr. XXIX, 4, 28; Ex. J–6, pp. 6, 27, the doctors using the forms have often failed to diagnose tardive dyskinesia and drug-induced parkinsonism. Tr. XVII, 25–38; Tr. XXII, 145–46; Tr. XXXI, 64–65; Ex. P–71, pp. 3, 5; Ex. J–6, p. 44. It is not always clear whether nurses are completing the forms instead of physicians. Tr. XXXI, 62.

Furthermore, the court believes that medication decisions are often left to nurses or even attendants because the doctors will ratify their recommendations without examining the patient involved. Tr. XXIII, 56–59. There is also overuse of medication orders which specifically leave discretion to the staff for many days, or weeks, despite hospital rules against such practice. Tr. XXIX, 98–100; Ex. D–23, pp. 42–43; Ex. P–48. Doctors also continue to use poor medication practices, such as unjustified polypharmacy. Tr. XXXI, 103–09; Ex. P–29, p. 61.

The medical directors have begun to improve patient records, including pharmacy records, although there is still much to be done in this respect. Tr. XXII, 29, 73–80; Tr. XXIX, 18–25; Tr. XXXII, 70–73, 170–72; Ex. D–23, p. 40; Ex. J–7, p. 58. There has also been an attempt to better educate physicians in the use of psychotropics. Tr. XXIX, 28; Tr. XXX, 36–37; Ex. J–7, p. 58.

### III. *Incidents Involving Individual Patients*

Before turning to the general procedures concerning refusal of medication, the court will discuss the representative experiences of five of the many individual patients whose cases were brought to the court's attention during the hearings as indicative

---

**3.** Doctors have recently studied ways to reverse the effects of tardive dyskinesia, and have had some tentative successes in certain types of patients. Gelenberg, Doller-Wojcik & Growdon, *Choline and Lecithin in the Treat-* *ment of Tardive Dyskinesia: Preliminary Results from a Pilot Study*, 136 Am. J. Psychiatry 772 (1979) (Ex. D–49); Jus, Jus & Fontaine, *Long Term Treatment of Tardive Dyskinesia*, 40 J. Clin. Psychiatry 72 (1979) (Ex. D–48).

of the practices and policies of defendants Klein and Rotov and their hospitals. Although the names of all but one patient appear in the record, their names, with the exception of Mr. Rennie's, will not be used in this opinion.

The first patient is a 23 year old woman who was involuntarily committed to Ancora in 1978. She has had a history of mental illness and hospitalization since she was ten. Tr. XVIII, 82–85. At Ancora she was given psychotropic drugs which often blunted her consciousness to such an extent that she would spend much of the day sleeping. *Id.* at 86–87. Heavy doses were probably given in response to her quarrelsome and sometimes violent relationship with ward staff, which can, in large measure, be attributed to the fact that she felt unneeded and idle on the ward and was sometimes subject to physical assault from attendants. *Id.* at 90–101.

Until January 1979 she usually took medication without objection, and, on occasion, even requested it. *Id.* at 87, 106–07. However, she was also threatened with forced injection of medication when she expressed reluctance to take drugs. *Id.* at 88. In January she began openly resisting drugs because she had become pregnant and "did not want to hurt my baby." *Id.* at 89. In disregard of her pregnancy and her opposition to drugs, the treating physician persisted in prescribing psychotropics, and the patient was forced to complain to the Public Advocate's office, which interceded. *Id.* at 89, 103–05. Nevertheless, with the approval of the hospital medical director, Tr. XXXIII, 71, she was given haldol, a psychotropic, on March 16, 1979. Ex. P–54. One week later she ingested a small amount of detergent and was transferred to the hospital's medical unit. *Id.* That unit immediately stopped her use of haldol because of her pregnancy and because her diagnosis did not require use of psychotropics. Ex. P–29, pp. 52–54. The medical unit also allowed her to do small chores on the ward. Her general condition rapidly improved and she became very cooperative with ward staff. Tr. VIII, 94–95. On May 16 she was discharged and has remained off medi-

cation. *Id.* at 88, 96; Ex. D–74. Her demeanor when she testified in court was excellent.

In summary, despite the patient's hesitance and outright refusals, and her pregnancy, Ancora physicians on the psychiatric ward persisted in medicating this patient by force or intimidation when a change in environment was the least restrictive treatment indicated. A change was, in fact, quite beneficial. However, only the patient's drastic action insured the transfer she needed and an independent evaluation by another doctor.

Another woman, 66 years old, was an involuntary patient at Greystone for 10 years. Plaintiff's expert diagnosed her illness as manic-depressive psychosis. Tr. XXXII, 58. The hospital had given her diagnoses of both manic-depressive psychosis and schizo-affective schizophrenia at different times. *Id.* at 59.

Recently this patient began refusing doses of thorazine, although she accepted lithium which is the drug of choice for manic-depressive illness. *Id.* at 60. Her refusal was, according to plaintiffs' expert, "very good judgment." *Id.* at 93. The expert credibly characterized the thorazine prescription as "grossly irresponsible," due to the reasonable success of lithium alone, her symptomatology, and particularly because the patient has tardive dyskinesia. *Id.* at 67–68.

In fact, a neurologist's report from 1975 in her medical record indicated she had a "classical" case of tardive dyskinesia, *id.* at 79, but his report was apparently lost in her records. *Id.* at 62. A January 1979 note in her record indicated that her jaw movements were "faking," *id.* at 65, although plaintiffs' expert testified that her movements were "so gross as to be unable to fake." *Id.* at 66. Indeed, because of her gross mouth movements from this disease she cannot be fitted with dentures and is forced to subsist on a diet of ground food. *Ibid.* She was also subjected to taunts from the hospital staff with the implication that the deformity was her own fault. *Ibid.*

Not only was thorazine prescribed, but it was also forced on this patient by injection at least once, in January of this year. *Id.* at 65.

Here, again, a psychotropic drug was involuntarily administered where there was little medical justification for the drug and great danger of creating or enhancing irreversible side effects. The side effects were blatantly ignored by doctors.

A third woman, a voluntary patient at Greystone, 60 years old, refused medication in August 1978 but was thrown onto a bed by attendants and given a long-acting form of prolixin by injection. The drug caused the patient severe discomfort. Tr. XVIII, 75–76; Tr. XXXII, 80–88. Plaintiffs' expert credibly testified that this was improper medication in this case and that the open ward privileges then given her were inconsistent with the suicidal diagnosis appearing in the patient's record. Tr. XXXII, 89–9–0. The expert believed many of her psychotic symptoms stemmed from her frustrations with hospital staff and delays in her discharge planning. *Id.* at 82–83.

The hospital medical director was involved in the decision to forcibly medicate this patient, and upheld the treating physician's decision based on the physician's reports. Tr. XXXI, 49–51. Review by an independent hearing officer before the forced injection might have aired this patient's complaints and may have prevented the questionable use of prolixin.

An intervenor in this action, age 29, was a voluntary patient at Ancora. Although the Public Advocate wrote a letter in March 1979 on the patient's behalf indicating the patient's dissatisfaction with his medication, long-acting prolixin, Tr. XX, 18; Ex. P–15, he continued to receive the medication. Tr. XVII, 114. At this time the hospital had him involuntarily committed, but did not follow Division procedures for involuntary patients who refuse medication. *Ibid.*

After several letters from the Public Advocate, the hospital responded by continuing prolixin but refusing to give cogentin, a drug which the patient wanted because it is used to alleviate certain painful side-effects

of prolixin. Tr. XX, 37–38. Finally, in June of 1979 the patient was given another form of psychotropic, which caused him substantially less discomfort, and he was able to leave the hospital a few weeks later. Tr. XVIII, 118, 128.

Here, the intervention of the Public Advocate caused reprisals against the patient. The hospital failed to follow Division procedures for reviewing the refusals of involuntary patients, and subjected him to great suffering which could have been alleviated by simply changing from one psychotropic to another.

Turning to Mr. Rennie, the original plaintiff in this action and an involuntary patient at Ancora, the court first notes the imprudent use of prolixin which caused plaintiff to experience severe side effects. During the hearings in this litigation in 1978, his condition and treatment were brought to light before the court and were subject to the evaluation of psychiatrists outside the hospital. Through this process, the hospital acknowledged Mr. Rennie's aversion to the drug and agreed to give him another psychotropic. 462 F.Supp. at 1134–35.

The court is also concerned with the hospital's treatment of Mr. Rennie's extrapyramidal side effects. One nurse, who had recorded Mr. Rennie's abnormal jaw movements, was criticized and intimidated for her actions by doctors and nursing supervisors. Tr. XXIII, 62–64. Mr. Rennie's case has been continuously reviewed by the medical director of Ancora since this litigation began in 1977; he has approved forced administration of psychotropics. He has failed to record jaw movements indicative of tardive dyskinesia. Tr. XXXIII, 57, 59; Ex. D–44. However, movements have been detected by other personnel and plaintiffs' highly qualified experts. Tr. XV, 91–92; Tr. XVII, 35; Tr. XXII, 150; Ex. P–29, p. 83; Ex. P–56, p. 26. The medical director's questionable judgment in failing to acknowledge Mr. Rennie's jaw movements appears to be a result of institutional self-interest. A diagnosis of possibly irreversible side effects would impugn the wisdom of

previous use of psychotropics and would necessitate less reliance on drugs in treating the patient in the future. Here, the medical director's review did not serve as an independent check free of these institutional pressures which result in unnecessary and harmful use of drugs.

### IV. *Hospital Procedures Concerning Forced Medication*

#### A. Adoption and Initial Implementation of Bulletin 78–3

In March 1978, Dr. Rotov issued Administrative Bulletin 78–3, which is reprinted as an appendix to the November opinion. 462 F.Supp. at 1148–51. This represented the Division's first formal attempt to deal with the problem of patients who refused medication, and was in response to the issues raised in this litigation. Ex. P–33, pp. 6, 72; Ex. D–23, p. 46.

The Bulletin, ¶ I(C)(3)(a), acknowledges the right of voluntary patients to refuse medication, which is provided by state law. N.J.Stat. 30:4–24.2(d)(1).

For involuntary patients, the Bulletin refers to a decision of the New Jersey Superior Court, *In re Hospitalization of B*, 156 N.J.Super. 231, 383 A.2d 760 (Law Div. 1977), which held that involuntary patients have no right to refuse. When an involuntary patient refuses, the Bulletin provides that the treating physician shall attempt to explain the risks and benefits of the drug. If refusal persists, the issue is to be discussed at a meeting of the treatment team, which is composed of the treating physician and various other persons at the hospital who deal with the patient, including psychologists, social workers and nurses. ¶ II(C). However, the team's collective opinion is only a recommendation to the treating physician. ¶ II(D).

Legally competent patients may have their cases heard by the medical director of the hospital. He must conduct a personal examination of the patient before approving involuntary medication. ¶ II(D). He may consult an independent psychiatrist if he wishes, and must review the patient's treatment program each week that the patient continues to protest his medication. ¶ II(E). The patient may have an attorney present during this process. ¶ II(B)(c); Tr. XXIX, 56; Tr. XXXI, 69.

The Office of the Commissioner also decided in March of this year that Dr. Rotov or another physician in the Division's central office should review the cases of any patient compelled to take medication by a decision of the medical director. Tr. XXX, 39–40, 88; Ex. P–47, p. 94. At the time of the hearing, however, a central office representative was able to indicate with certainty that Dr. Rotov reviewed the medical charts of Mr. Rennie and only one other patient. Tr. XXX, 91–94. The witness said Dr. Rotov might have reviewed "several" other cases, and examined some patients personally, *id.* at 40, 88. The court finds that this level of review is hardly a regular procedure, and is not quickly or reliably available to patients. *Id.* at 88–89.

The Division central office has also failed to insure that the Bulletin was rapidly implemented. The testimony shows that it was completely ignored at least at Marlboro and Greystone until December 1978. Tr. XXIX, 19; Tr. XXXI, 11, 72; Ex. D–23, pp. 20–21. The medical director of Marlboro was not even told the document existed until November of last year. Tr. XXIX, 33.

#### B. Obtaining Consent and Acknowledging Refusals

A major problem in implementation of Bulletin 78–3 is identifying those patients who refuse drugs. At Marlboro Hospital about 40 to 50 patients a month have been recorded as refusing. Tr. XXIX, 20, 87–88; Ex. D–34, pp. 45–48. Trenton Hospital has reported about 15 to 40 a month. Ex. D–38, pp. 46–49. Ancora Hospital has invoked the Bulletin for only Mr. Rennie and the 23 year old woman discussed above. No other patient has been reported to have refused since the beginning of the year. Ex. P–33, p. 77; Ex. D–35, pp. 24–26. Greystone has only reported three patients refusing since the beginning of the year, Ex. P–33, pp. 80–81; Ex. P–47, pp. 29–31, and the Gard-

ner Geriatric Center has only acknowledged one refusal. Ex. D–47, pp. 26–28; Ex. J–6, p. 24.

The record also reflects the fact that in a ward of 70 patients at Boston State Hospital, which has been prohibited from forcing medication by federal court order, 10 to 12 patients refuse medication at any one time. Tr. XXVII, 35–36. A psychiatrist with experience at state hospitals in New York testified that five percent of patients refuse medication at a given time. Tr. XXVIII, 12.

The patient populations at Trenton, Marlboro and Boston State are similar to those at Greystone and Ancora. The court attributes the discrepancy in statistics to a substantial failure by staff at the latter hospitals to report refusals. Also, certain hospitals overuse the exception in the Bulletin for emergency situations. Tr. XXX, 17.

Even if all hospitals accurately reported the number of overt refusals by patients, many patients are too intimidated to attempt to refuse medication and would still be ignored. Certainly there has been extensive use of forced injections in the hospitals when both voluntary and involuntary patients refused to take medication orally. Tr. XVIII, 71, 75, 88, 115; Tr. XX, 8–20; Tr. XXII, 18–20, 104; Tr. XXIII, 74–76; Tr. XXIX, 112–19; Tr. XXXI, 95–107; Tr. XXXII, 65; Ex. P–28, p. 11; Ex. P–35, p. 6; Ex. P–60; Ex. P–61; Ex. P–65; Ex. P–75. The Marlboro medical director candidly admitted that drugs are still systematically forced on patients. Tr. XXIX, 137. Often forced injections are doses of long-acting prolixin which not only has a much longer effect than other psychotropics but usually has more immediate adverse side effects. Tr. XXII, 104; Tr. XXXI, 108; Ex. D–23, 70–71; Zander, *Prolixin Decanoate: A Review of the Research*, in 2 Mental Disability L. Rep. 37, 39 (1977). Therefore it would be quite rational for patients to conclude that resistance to drugs would result in their receiving a more unpleasant medication.

There is little evidence that the hospitals have taken affirmative steps to inform patients of their rights, Tr. XXIX, 30, although a pamphlet for patients is being prepared by the Division central office. Tr. XXX, 24–25; Ex. D–25, pp. 12–14, 19–20, 29–31.

Despite this situation, the hospitals only initiate review under the Bulletin where a patient affirmatively refuses to take a drug (assuming an overt refusal is acknowledged at all). Complaints or reluctance are not enough. Tr. XXII, 97–98; Tr. XXIX, 101–02, 136; Tr. XXXI, 99.

There has been recent discussion in the central office concerning the use of written consent forms for medication, Tr. XXX, 20; Ex. D–25, p. 12, but there are no specific plans to employ them.[4] Preparation of information pertaining to the harms, as well as benefits, of drugs is also being considered in order to render medication consents informed. Tr. XXX, 21–25. Indeed, Marlboro and Ancora have started drug education classes and are preparing information forms; yet these lectures and material fail to disclose fully the danger of long-term side effects including tardive dyskinesia. Tr. XVIII, 85; Tr. XXII, 86; Tr. XXIX, 30; Ex. D–23, pp. 32–34; Ex. D–34, pp. 12–27.

Another step that the Division has taken is the appointment of "patient advocates," one each at Marlboro and Ancora. Tr. XXX, 26. They are available to patients who have various problems, including complaints about medication. They can initiate review procedures under the Bulletin. Tr. XXIX, 13–14, 40, 61; Ex. P–29, pp. 98–100; Ex. D–23, pp. 57–63. *See also* Ex. D–18, pp. 91–92. The Marlboro advocate is responsible to that institution's chief executive officer (a non-medical administrator who is the highest officer at the institution), while the Ancora advocate is responsible directly to the Division central office. Tr. XXX, 26–27; Ex. D–23, p. 63. A Division official acknowledged during her testi-

4. It should be noted that even at Gardner Geriatric Center, where patients are generally the most incapacitated, consent forms are successfully used for drug experimentation. Ex. J–6, p. 14.

mony that the advocate should not be responsible to hospital officials so that he can pursue his independent advocacy role. Tr. XXX, 67–68. There are tentative plans to hire an advocate at each hospital. *Id.* at 28.

The Division of Mental Health Advocacy, Department of the Public Advocate, which represents the plaintiffs in this litigation, has legal and paralegal representatives at different hospitals who can assist patients in asserting their rights. However, this agency lacks the resources to provide services for all patients who do not or cannot consent to medication. Ex. D–25, pp. 27–28. The Department is generally charged with representing citizens on important matters in the public interest.

It should also be noted that some patients, particularly those on geriatric wards, are permanently out of touch with their surroundings and incapable of expressing informed consent, though few of these patients have been declared legally incompetent. Tr. XXII, 40; Ex. J–6, pp. 9–10, 32.

### C. Reviewing Refusals

Much of the evidence concerning use of Bulletin 78–3 focused on review by the medical director of refusals by involuntary patients. Few of the recorded refusals even reach that level, partly as a result of legitimate and desirable agreement by patients with their doctors or treatment team to take some medication, and partly the result of wrongful coercion of patients. The Marlboro medical director overruled three of the ten cases which reached his desk since adoption of the Bulletin. Tr. XXIX, 21–22; Ex. D–34, pp. 45–47. The Ancora medical director upheld the treating physician in the two cases referred to him. Tr. XXXIII, 71; Ex. D–35, pp. 24–26. The same statistic applies to Greystone. Tr. XXXI, 14; Ex. P–47, pp. 29–31. At Trenton, the medical director rescinded half of the six forced medication orders she reviewed. Ex. D–38, pp. 46–49. There is no evidence of any decision reaching the medical director at Gardner. Ex. D–36, pp. 45–47.

The court does not find these statistics themselves indicative of the capability or independence of the medical directors. But these officials can be faulted for their failure to insure that the Bulletin is fully implemented, that patients' refusals are acknowledged and counted, and that force and threat of force or punishment is not used to administer medication.

The medical directors asserted in their testimony that they indeed can exercise independent and conscientious reviews. Tr. XXIX, 21–22; Tr. XXXI, 13; Tr. XXXIII, 40. But some of the individual cases described above rebut those assertions. The Greystone medical director even delegated his responsibility to every staff psychiatrist under a clause in the Bulletin which allows another doctor to act for the medical director when he is away; however, this interpretation was later overruled by Dr. Rotov. Tr. XXXI, 48–49. The Ancora medical director testified that, in his opinion, an emergency justifying forced medication could last over 30 days. Ex. P–29, p. 31. In fact, the medical directors have not even acknowledged a constitutional right to refuse treatment or followed the court's guidelines on the law in deciding refusal cases. Tr. XXIX, 21; Tr. XXXIII, 40.

The medical directors' actions demonstrate a lack of independence and objectivity when reviewing the actions of their staffs. The court believes this stems largely from their responsibilities; they must have the support of their personnel, whose jobs are made easier when patients are subdued by medication. Unfortunately the rights and health of patients are sometimes ignored.

In many cases the patient's refusal of medication is prompted solely by the irrational components of his illness. Tr. XXVII, 51; Tr. XXVIII, 13; Tr. XXIX, 15; Tr. XXXI, 16. But refusals can also be prompted by a quite rational desire to avoid unpleasant side effects and a realistic appraisal that the medication is not helping one's condition, which are both subjective factors on which the patient may be the best authority. Tr. XXVII, 94–95; Tr.

XXIX, 78–79; Tr. XXIV, 129; Tr. XXXI, 66.

The author of one study of why schizophrenic patients refuse drugs concluded that "the reluctance to take chemotherapeutic agents and the dysphoric response to antipsychotic drugs are usually related to [extrapyramidal side effects]." He also noted that much of the side effects "that led to drug reluctance [were] of the 'mild' or subclinical type which is apparent only to the careful observer . . . . the subtler extrapyramidal symptoms often go unrecognized by the physician—but not by the patient!" Van Putten, *Why Do Schizophrenic Patients Refuse to Take Their Drugs?*, 31 Arch.Gen.Psychiatry 67, 70, 71 (1974) (Ex. P–73). The same author found in another study that "the subjective response very early in chlorpromazine [thorazine, a psychotropic] treatment may predict, to a moderate degree, the symptomatic outcome after a sustained course of treatment with the drug . . . . schizophrenics have been asked every question except, 'How does the medication agree with you?' Their response is worth listening to." Van Putten & Ray, *Subjective Response as a Predictor of Outcome in Pharmacotherapy*, 35 Arch.Gen.Psychiatry 477, 478–80 (1978) (Ex. P–46).

The court is convinced that where patients' concerns and feelings may be more freely aired, and observable side effects are more closely monitored, medication will be used more wisely. If the refusals of involuntary patients are fairly acknowledged and independently considered in accordance with the legal criteria, a significant number of patients will receive less or no medication, frequently to their benefit.

### V. *Independent Review*

Certain testimony concerned plaintiffs' request for independent review by some type of hearing board or examiner of decisions to forcibly medicate. The court accepts the opinions of those experts who indicated that someone outside the hospital structure would provide a fairer, more accurate review of patients' refusal rights. Tr.

XVII, 85; Tr. XXIV, 108–11; Tr. XXVI, 58; Tr. XXXII, 160–63.

The court also believes that if an independent check on forced medication is established, doctors would learn the legal limits of involuntary medication and the number of attempts to force psychotropics would eventually decrease. This would also mean that the number of cases reaching an independent decision-maker would eventually drop to a relatively small number of disputes. The court cannot specifically gauge the cost of an independent review system, but it rejects the $3 million per year figure provided by defendants, Tr. XXX, 42–46, as based on overestimates of the number of reviews and the number of hours required for each hearing.

More sensitivity on the part of treating physicians would also engender better patient-doctor relations. Less use of psychotropics and more attention to patient's feelings about their treatment would likely improve patient-staff relations and foster patients' individual dignity. Tr. XXIX, 19, 78–79, 89–90. While the authority granted an outside review officer will initially cause resentment among many doctors and staff members of the hospital, Tr. XXVII, 49; Tr. XXXIII, 43, the court believes that a carefully structured review system would eventually be accepted by most personnel, as review under the Bulletin has been accepted. Tr. XXIX, 19; Tr. XXXI, 13; Ex. P–29, p. 47.

The court further finds that independent review by psychiatrists, rather than by judges, lawyers or laypersons, would provide the most accurate analyses of patient interests. Review within the profession would also create far less resentment among physicians and staff whose decisions are questioned. Tr. XXIII, 35; Tr. XXIV, 107; Tr. XXVII, 96–97, 106; Tr. XXVIII, 40. Informal inquiries would be superior to formal procedures because the latter would require more time and resources and often be more disruptive of patient-doctor relations, but would not significantly decrease the risk of erroneous determinations.

## CONCLUSIONS OF LAW

### I. *Procedures Required*

■ The evidence produced at this hearing reinforces the court's previous conclusion that a qualified right to refuse treatment should be recognized, and that due process must be provided before drugs can be forcibly administered. 463 F.Supp. at 1145–47. The rationale for these holdings need not be repeated here.

The due process holding is also strengthened by the Supreme Court's recent decisions in *Parham v. J. R.*, —— U.S. ——, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) and *Secretary of Public Welfare v. Institutionalized Juveniles*, —— U.S. ——, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). These cases, which dealt with the due process rights of juveniles who were voluntarily committed to mental institutions by their parents, or by their state as guardian, held that commitment constitutes a deprivation of a protected liberty interest. 99 S.Ct. at 2503. This court feels that forced drugging can be as intrusive as the involuntary confinement resulting from commitment, and that drugging also has the potential for permanent deprivation through long-term side effects.

After consideration of the evidence at this hearing, the court further concludes that the privacy and due process rights previously recognized in Mr. Rennie's individual case should apply to all other members of the subclass of involuntary patients.

The same reasons compel recognition of the privacy right for voluntary patients. Much of the relief which the court will afford that subclass derives from this federal constitutional right. However, all parties recognize that voluntary patients have an absolute right to refuse treatment under state law. N.J.Stat. 30:4–24.2(d)(1). This right may be enforced in a civil action. N.J.Stat. 30:4–24.2(h). One part of the order is based on this right, heard as a pendent claim.[5]

It is not disputed that defendants acted under color of state law.

Plaintiffs do not ask the court to prohibit the administration of drugs to any particular patient. Rather they seek sweeping changes in hospital practices designed to protect their rights. Thus the crucial issue presented is what procedures are, at a minimum, required to protect the plaintiff's constitutional rights. While defendants have never acknowledged that a constitutional right to refuse exists, they also contend that procedures which have been instituted in the last year serve to meet any constitutional requirements.

■ In determining the procedures needed for affording members of both subclasses their constitutional right to refuse treatment, the court must consider the degree of vulnerability and helplessness of patients in the five hospitals, as well as the history of compelled medication through the use of forced injections which has created a general belief among many patients that medication cannot be refused. Given these realities—brought about by widespread improper practices on the wards—the court believes the constitutional right to refuse can be realistically afforded only if the hospitals, whenever possible, obtain specific, written consent from patients before they are medicated with any psychotropic drug. The hospitals must also inform patients of their rights and the potential side effects of medication in order that all consents be properly informed.

**5.** The court has jurisdiction over the constitutional claims of both subclasses under 28 U.S.C. § 1343(3). Exercise of pendent jurisdiction over claims based on the state law rights of voluntary patients is proper here because there is a common nucleus of operative fact linking that subclass' federal and state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Pendent jurisdiction is justified on the grounds of judicial economy and convenience due to the court's extensive inquiry into hospital practices required by the federal claims alone. *See id.* at 726, 86 S.Ct. 1130. As the voluntary subclass has both federal and state claims, jurisdiction over the state claim is based on the pendent claim doctrine, and not on pendent party jurisdiction through joinder with the federal claims of the involuntary plaintiffs. Therefore the jurisdictional bar of *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), is inapplicable.

Both subclasses are entitled to this procedure as both hold the constitutional privacy right. Whether New Jersey law requires the same specific consent for voluntary patients need not be determined here. However, the court does construe New Jersey law to mean that once a voluntary patient withholds under this procedure, the hospital cannot medicate in a non-emergent situation. Accordingly, there is no need for a due process hearing for these patients. Of course, appeals to the voluntary patient by the treatment team or medical director in order to obtain his freely given consent are proper.

■ On the other hand, the informed refusal of an involuntary patient may be overridden, as these patients' right to refuse is a qualified one. Any forced medication decision must be made by considering the four factors outlined in the court's November opinion. As forced medication implicates a sufficient liberty interest, due process safeguards must be instituted as part of this determination. The court, in dictum in its November opinion, noted some of the procedures which might be necessary. 462 F.Supp. at 1147–48. *See also Task Panel Reports Submitted to The President's Commission on Mental Health* 1435–36 (1978).

The Supreme Court's subsequent opinions in *Parham* and *Institutionalized Juveniles* must be considered in determining what process is due. The Court in those cases held that the district courts below had erred in requiring formal hearings before minors were committed. These holdings are not strictly applicable to the forced administration of drugs to involuntary adult patients since the Supreme Court's decision was in large part based on its great concern with governmental interference with parental decisions about their minor children. 99 S.Ct. at 2507. Even so, the Court held that a "neutral factfinder" must review the parents' commitment decision. *Id.* at 2506.

This court believes that a neutral, independent decision-maker is also crucial in the treatment context, and must be provided to insure the minimum quantum of due process to patients.

In *Parham* and *Institutionalized Juveniles* the Supreme Court found that review by staff physicians satisfied due process. The Court noted in *Parham* that the record provided "no support whatever' for the conclusion that staff physicians could not be neutral because of institutional pressures to admit children with no need for care. *Id.* at 2511.

The Court also held that a physician was an adequate decision-maker because

[d]ue process has never been thought to require that the neutral and detached trier of fact be law-trained or a judicial or administrative officer. . . . Surely, this is the case as to medical decisions for "neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments".

*Id.* at 2506–07. Certainly this also applies to consideration of the four factors this court has held qualify the right of patients to refuse medication.

The *Parham* Court also emphasized that formal procedures are not always required:

[D]ue process is not violated by use of informal traditional medical investigative techniques. . . . Not every determination by state officers can be made most effectively by use of the "procedural tools of judicial or administrative decision-making." . . . [I]t is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems.

*Id.* at 2507 & n. 16. The court will not require a formal hearing, or even the presence of an attorney, at the mandated independent review. Any more process than an informal inquiry may cause excessive costs to the state without significantly decreasing the risk of erroneous determinations.

■ . In determining what unconstitutional conduct can form a basis for relief, the court must also apply the principles stated in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598,

46 L.Ed.2d 561 (1976) and Lewis v. Hyland, 554 F.2d 93 (3rd Cir.), cert. denied, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977). Under these cases, the court may not enjoin defendants Klein and Rotov, the relevant defendants in the two statewide subclass' right to refuse treatment claims, unless a constitutional violation is caused by their policies or deliberate indifference. Isolated incidents of improper conduct by individual psychiatrists or other staff are not sufficient to sustain class-wide relief. *Rizzo*, 423 U.S. at 373–77, 96 S.Ct. 598; *Lewis*, 554 F.2d at 98. *See also Owens v. Haas*, 601 F.2d 1242, at 1246 (2nd Cir. 1979).

*Rizzo* also requires a certain equitable restraint or abstention where relief is sought against a state agency. 423 U.S. at 377–80, 96 S.Ct. 598. The court is fully cognizant of the principles of federalism stated therein, and must attempt to fashion any order such that it disrupts hospital operations as little as possible. But the court must also be vigilant to insure that plaintiffs' rights are upheld. As stated by Chief Judge Lord of the Eastern District of Pennsylvania:

> Notions of comity and the limitations placed upon the use of federal equitable power restrain federal courts from intruding into daily operation of state agencies. But federal courts also have the clear obligation to terminate conditions and actions which violate constitutional rights, particularly for those who are powerless to end such abuse.

*Santiago v. City of Philadelphia*, 435 F.Supp. 136, 149 (E.D.Pa.1977).

Medicine has not yet found a cure for the terrible pain of mental illness. The law cannot assist in this endeavor. But the constitution can and does prevent those who have suffered so much at the hands of nature from being subjected to further suffering at the hands of man.

## II. *Inadequacies in Division Practices*

While the Division has made certain commendable efforts to improve the procedures surrounding administration of drugs, the court holds that defendants' policies nevertheless fail to meet constitutional standards in a few critical areas. While there have been numerous acts by individual treating physicians and staff which are outside constitutional standards, the court must emphasize that the current policies and mandated procedures of defendants Klein and Rotov and their conscious and deliberate indifference to breaches of patients' rights by hospital personnel form the basis for relief in this action. Remedial action is not barred by *Rizzo* and *Lewis*.

■ The evidence has shown that defendants are contemplating certain steps which might correct some of the inadequacies found. However, defendants have refused to stipulate that procedures that have been mandated in writing will be fully implemented, much less that other measures contemplated will be carried out. Therefore the court must order certain procedures which might have become Division practices regardless of the court's action. The court is naturally reluctant to so order, but feels that this intervention is proper at this time because certain orders are required anyway and because defendants refuse to guarantee that such measures—which undoubtedly have been spurred by the litigation so far—will indeed be implemented. The rights at stake here are too important to wait on unsubstantiated promises of compliance.

The first major shortcoming in the hospitals' procedures is failure to adequately inform patients of their rights and the effects of drugs, particularly long-term side effects. While certain improvements are contemplated, the hospitals' current record reflects a total failure by defendants Klein and Rotov to insure that all patients are aware of the dangers of their medication, and know that they can reject or appeal medication decisions of their doctors.

Second, the hospitals have not sought written consent to specific administration of drugs. Such a step is apparently contemplated, though there is no indication in the record when or whether it actually will be implemented. Neither have defendants made any provision for independent review of those patients who may be incapable of

giving informed consent. All of these problems are sufficiently linked to the policies or deliberate indifference of defendants Klein and Rotov to justify classwide equitable relief because defendants have refused to implement informed consent procedures despite the atmosphere of coercion in the wards that makes such steps absolutely necessary for providing patients a realistic refusal right.

The court also finds improper the defendants' policy of limiting review of a physician's decision to forcibly medicate to informal hearings before the treatment team and hospital medical director. This does not constitute the independent determination required by the due process clause, and the case is thus distinguishable from *Parham*. Here there are institutional pressures on treating physicians to medicate patients unnecessarily. Treatment team review is somewhat controlled by the treating physician and cannot constitute an independent determination. While the medical directors have asserted in their testimony that they are capable and willing to overrule their staff doctors when necessary, the court finds more credible the testimony of those experts who stated that the directors would inevitably be caught in a conflict between patients' interests and pressures from their staff.

The court does not impugn the good faith of the directors, who appear genuinely determined to reduce unnecessary reliance on drugs and to increase the involvement of patients in their own treatment decisions. Rather the court believes that institutional pressures—similar to the pressures that have created the unfortunate legacy of overdrugging in state mental hospitals—make it impossible for anyone in the medical director's position to have sufficient independence, much less the appearance of fairness which due process requires. In different contexts the law has required that a decision-maker be outside the state bureaucracy whose actions impinge on individuals' protected interests. *See, e. g., Morrissey v. Brewer*, 408 U.S. 471, 485–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation hearings). This is particularly important where informal procedures are allowed. As stated by Judge Friendly:

> [A]gencies might be offered an option of less procedural formality if the decision-maker were not a member of the agency and still less if, as in England, he were not a full-time government employee at all.

Friendly, Some Kind of Hearing, 123 U.Pa. L.Rev. 1267, 1279 (1975).

While review by the medical director may be a prudent check inside the hospital structure, the court must hold that it does not meet the dictates of the law.

There is evidence that Dr. Rotov, the Division Director, or one of his assistants in the central office, are willing to review the medical directors' decisions to forcibly medicate. While this might provide an adequately independent decision, there is no indication in the record that Dr. Rotov or his current assistants would have the time or willingness to review the significant number of cases that may be appealed once patients are fully informed of their rights. It should also be noted that the medical directors' authorization in Bulletin 78–3 to consult an independent psychiatrist does not insure such an independent review in every case, nor are the consultant's recommendations binding on the medical record.

The court finds review by a psychiatrist, rather than a judge or administrative hearing officer, to be constitutionally adequate. Therefore, in structuring the order entered against defendants, the court will allow the independent decision-maker to be a psychiatrist, which is apparently the defendants' preference if relief must be granted on this point. Indeed, such a review would be similar to the central office review which has been proposed.

The defendants have no system for providing representation to patients who appeal the decisions of their staff psychiatrists. While the defendants have tentative plans to place a patient advocate at each hospital, there is no guarantee in the record that such a step will be taken or that representation will be assured for all who refuse.

■ Finally, the policies and procedures of defendants are inadequate because defendants have failed to even acknowledge and instruct their staff that involuntary patients have a qualified right to refuse.

### III. Standards on a Preliminary Injunction

■ Four factors are considered in the application for a preliminary injunction: (1) whether the moving party has shown that it is likely to prevail on the merits, (2) whether the movant has demonstrated that he would be irreparably harmed if the preliminary injunction is denied, (3) whether the grant of the injunction would harm other interested parties to a greater extent than it would benefit movant, and (4) whether the public interest would be served. *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 525 (3rd Cir. 1976).

After 17 days of hearings, the plaintiffs have clearly demonstrated a likelihood of prevailing on the merits on the recertified classes. It is also clear if defendants are not enjoined plaintiffs will be irreparably harmed by the transient discomfort and permanent injury caused by medication. The court finds that prevention of these harms outweighs the additional administrative costs the order may impose on the state. Finally, protection of plaintiff's constitutional rights is indisputably in the public interest.

### IV. Explanation of the Decree

■ The court has attempted to closely tailor its order in this case to the clear violations of privacy and due process engendered by the policies of defendants. The order is designed to interfere with hospital operation as little as possible while still guaranteeing a realistic opportunity for patients to exercise their qualified right to refuse treatment. The court has also tried to include in its decree those ideas discussed by defendants themselves, but never fully implemented, which, when put into full effect, would satisfy constitutional requirements.

The order has five components. First is use of affirmative consent forms which must be signed by all patients before they are medicated. The court believes this is the least intrusive way to insure that involuntary and voluntary patients will have the opportunity to assert their constitutional rights despite the history of coercion and intimidation in the hospitals. The forms must contain the information on drugs and patient rights so that consents will be informed.

The second component is a system of Patient Advocates, which is essentially a full implementation of an idea which has been carried out by the Division in limited form only. *See also* Ex. D–18, p. 91. The Advocates are given two areas of responsibility. First, they are to analyze cases where the treating physician certifies that a patient is incapable of providing informed consent. At that time an Advocate may act for the patient and obtain in-hospital and independent review, although medication is permitted during that time. The court notes that it would be unrealistic to rely on legal guardians to protect the rights of incompetent patients in this respect. *See* Tr. XXVII, 19–20.

Advocates shall also serve as informal counsel to patients who wish to refuse, and, in particular, those whose cases are reviewed by an independent decision-maker.

The court believes that the Patient Advocates will play a crucial part in upholding patients' rights. It is anticipated that these individuals will be required to withstand great pressures from hospital doctors and staff. But the patients, as well as this court, will rely on their fortitude and perseverance. The Advocates are to be appointed by the Office of the Commissioner of the Department, Ms. Klein, in order to insure their independence from the hospital bureaucracy, and it is the responsibility of the Commissioner to keep the Advocates autonomous.

The court has considered requiring defendants to obtain legal representation for patients from the Division of Mental Health Advocacy or from private attorneys paid by

the state on a retainer basis. This might better insure the independence of those counseling patients. However, this could only be required if the court simply prohibited all forced medication until the state legislature appropriated additional funds to the Department of the Public Advocate or for retained counsel. The court is naturally reluctant to do this when it hopes that Commissioner Klein and her successors will insure the necessary independence and qualifications of Advocates they appoint. The court believes attorneys are not necessary here, and may even be counter-productive since many compromises between patients' expressed desires and good medical practice will need to be made. The success of this aspect of the court's decree will be closely monitored during the time before a final order is entered.

The third component of the order is requirement of informal review by an independent psychiatrist before the hospital may forcibly medicate an involuntary patient. These psychiatrists will also be appointed by the Commissioner. The court believes a psychiatrist will be more effective in the role than a judge, lawyer or layperson, and that due process only requires an informal hearing which can readily be conducted by a medical person. In response to defendants' argument, the court notes that review of the medical director's decision to forcibly medicate by a panel of the Appellate Division of the Superior Court under N.J.Ct.R. 2:2–3(a)(2) does not meet due process. There is no evidence that such review has ever occurred, and almost certainly the scope of review would be restricted. *See New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 N.J. 544, 384 A.2d 939 (1978); *Parker v. Dornbierer,* 140 N.J.Super. 185, 356 A.2d 1 (App. Div.1976). Such review would also necessitate the appointment of independent counsel in every case.

The fourth part of the order is enforcement of voluntary patients' right to refuse treatment under state law, N.J.Stat. 30:4–24.2(d)(1).

The last component of the order is provision for forced medication in emergency situations, which, the court holds, not only qualifies the constitutional privacy right, but also the right of voluntary patients under state law. It also provides for the forced medication of patients involuntarily committed for short-term hospitalization under certain state statutes, but *only* in emergency situations. The court holds that the qualified privacy right is always outweighed in these emergency situations where the patient is in an acute psychotic state, has little competence but often is in great need of a psychotropic drug, and short-term use presents very little risk of permanent side effects.

The order only applies to psychotropic medication since it is the only type of drug for which there has been proof of harm to patients and overuse in the hospital.

The court has required that special reports on implementation of this decree and Department and Division orders on involuntary medication be submitted during the period before a final hearing is held and a final order is entered. However, the court relies on the Division of Mental Health Advocacy, plaintiffs' counsel, to scrutinize the implementation of the order in this case. The court will be open to further hearings if defendants fail to comply with the decree.

Finally, the court notes that while the provision of independent review here is intended to provide an efficient method for complying with due process, it does not preclude any member of the classes from bringing a civil rights action in federal court. However, appropriate deference would be given to a decision by an independent psychiatrist to allow a hospital to forcibly medicate an involuntary patient.

## PRELIMINARY INJUNCTION

Application by the involuntary adult subclass and voluntary adult subclass of plaintiffs and intervenors for a preliminary injunction having been heard by the court; and

The court having considered the testimony, exhibits, briefs and argument of counsel; and

For the reasons stated in the court's opinion filed this day,

It is on this 14th day of September, 1979, hereby ORDERED of defendants Klein and Rotov:

A. Beginning January 7, 1980, defendants shall establish for the adult units of the Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Marlboro Psychiatric Hospital, Trenton Psychiatric Hospital, and Glen Gardner Geriatric Center:

1. *Consent forms.* A system of consent forms to be signed by patients before they are prescribed psychotropic drugs by hospital physicians in non-emergent situations. Such consent forms shall state in plain language the right of voluntary patients to refuse treatment and the qualified right of involuntary patients to refuse and to have their refusals reviewed within the hospital, and by the independent psychiatrist as described in this order. The forms shall also state the availability of Patient Advocates to assist patients who wish to refuse treatment. Each form shall also state all known short-term and long-term side effects of the drug to be consented to, and may be supplemented by informal discussion by hospital staff with the patient concerning the risks and benefits of the drugs. A single form may be used to obtain the consent for up to three different medications, to be used concurrently or alternatively. Information on the rights of patients and the side effects of all psychotropic drugs used in a hospital shall be posted or made available on each ward.

2. *Patient Advocate.* The Office of the Commissioner of the Department of Human Services shall hire, pay, train and supervise an adequate number of Patient Advocates in each hospital. The Patient Advocates' duties shall include those described in this order. The Patient Advocates must be supervised by an attorney and psychiatrist in the Office of the Commissioner. The Advocates may be trained attorneys, psychologists, social workers, registered nurses or paralegals, or have any equivalent experience. They must be given training in the effects of psychotropic medication and the principles of legal advocacy.

3. *Independent Psychiatrist.* The Office of the Commissioner shall hire and pay psychiatrists to review the decisions to forcibly medicate involuntary patients.

B. Beginning January 7, 1980, no voluntary or involuntary patient age 18 years or older in the five hospitals may be given any drug commonly labelled "psychotropic" by the medical profession unless the patient has signed a consent form pertaining to the specific drug. The written consent shall apply indefinitely subject to the other conditions of this order. No voluntary or involuntary patient may be given psychotropic medication if he states to a doctor or nurse that he does not want the specific drug. An injection of psychotropic medication may not be based on a prior written consent if the patient orally refuses at the time of the injection. Patient Advocates may consult with any patient and assist him in refusing medication orally. An Advocate can also require that the hospital obtain renewed written consent if a patient who has previously given written consent has since orally refused. The medical director, and treating physician or other member of the hospital staff may encourage a patient to consent to and take medication; however, force or the threat of force may not be used unless forced medication is allowed for a patient under the terms of this order.

C. Medication may be given orally or by injection without written consent and despite oral refusals in the following circumstances:

1. *Emergency Situation.* Where the treating psychiatrist certifies in a voluntary or involuntary patient's record that there is an emergency situation. An emergency is a sudden, significant change in the patient's condition which creates danger to the patient himself or to others in the hospital. Medication may then be forcibly administered for 72 hours. Certification by the medical director of the hospital may extend

that period for 72 more hours if the threat to life or limb continues. Any person who is temporarily committed to a mental hospital or other institution pursuant to the procedures provided by the temporary commitment provisions of the New Jersey statutes[1] may be involuntarily medicated *only* if his condition constitutes an emergency situation as defined above, and any person who is involuntarily held in a mental hospital or institution but who has not been permanently or temporarily committed in accordance with the procedures mandated by the applicable New Jersey statutes may not be medicated against his will under *any* circumstances.

2. *Legally incompetent patient.* An involuntary patient declared legally incompetent may be medicated without written consent if proper consent is obtained in accordance with state law. However, decisions to medicate legally incompetent patients must also be referred to a Patient Advocate who may at any time assess the patient's feelings about the drug, side effects, failure to consistently take the medication and the use of force or threat of force by hospital staff to administer the drug. The Patient Advocate may then, in his discretion, initiate review under Administrative Bulletin 78–3, or similar hospital procedures succeeding that Bulletin, and may, in his discretion, seek review to the Independent Psychiatrist. The patient's guardian must be notified. Medication shall be permitted during the time period for review, which shall not exceed 15 days. A Patient Advocate shall review the treatment regime of each incompetent patient at least once every three months.

3. *Functionally incompetent.* A treating physician may certify in an involuntary patient's record that the patient is "functionally incompetent" because he is unable to provide knowledgeable consent to treatment, although he has not been declared incompetent by a court of law. These cases must also be referred to the Patient Advocate who shall review the case and initiate

review in the manner described above for legally incompetent patients.

D. Except as provided in Paragraph C(1) of this order, no voluntary patient may be medicated who does not sign a consent form or who orally refuses.

E. Except as provided in Paragraphs C(1) through (3) of this order, where an involuntary patient refuses to provide consent after all in-hospital procedures are exhausted, or where an involuntary patient refuses intermittently and the hospital seeks to give medication on a continuous basis, the hospital may seek permission to involuntarily medicate by bringing the patient before the Independent Psychiatrist, in accordance with the following guidelines (the same guidelines shall apply to hearings brought by a Patient Advocate under paragraphs C(2) and (3) of this order):

1. *Notice.* The patient must have at least five days between the first refusal to a staff nurse or physician and presentation to the Independent Psychiatrist.

2. *Advocate.* The patient shall be allowed to have an attorney and Independent Psychiatrist present at this hearing. However, the state need only supply a Patient Advocate if the patient cannot or does not wish to have his own private counsel. The Patient Advocates at each hospital shall be notified of all refusals reaching the Medical Director under Bulletin 78–3 so that an Advocate can prepare any cases appealed to the Independent Psychiatrist.

3. *Hearing.* The Independent Psychiatrist may hold an informal proceeding. All hospital records should be made available to the Independent Psychiatrist, and he may conduct a medical examination of the patient where necessary. No compulsory access to witnesses or cross-examination need be permitted, although the Independent Psychiatrist may request hospital employees to appear if he deems this necessary.

4. *Opinion.* The Independent Psychiatrist shall issue a written determination in each

---

1. N.J.Stat.Ann. 30:4–46.1 (seven day temporary commitment for observation); N.J.Stat.Ann. 30:4–26.3 (15 day temporary commitment for observation, examination, and treatment); and N.J.Stat.Ann. 30:4–37 and 4–38 (twenty day temporary commitment).

case, basing any decision to override the patient's privacy right on the four factors outlined in the court's November opinion. He may also consider whether the use of the drugs in a particular case violates the principles of the first and eighth amendments as discussed in the November opinion. 462 F.Supp. at 1143–44. He may "settle" the dispute by obtaining consent to treatment from the patient, or he may remand the case to the hospital medical director or treating physician for reformulation of a treatment plan in accordance with specific directives. He may prohibit use of psychotropic drugs altogether if required by the patient's preferences and his qualified right.

5. *Effective Period.* The Independent Psychiatrist may state a time period for which his decision allowing the hospital to forcibly medicate remains effective. This period should not exceed 60 days, and should preclude a patient from seeking review by the Independent Psychiatrist during that time. However, review may be had if the patient contends the hospital has failed to adhere to the Independent Psychiatrist's decision concerning proper treatment. The hospital may seek a rehearing in any case at any time.

F. In order to assist the court's consideration of the relief at the final hearing on the issues presented, defendants are ordered to submit monthly reports describing in reasonable detail their implementation of Administrative Order 2:13, Administrative Bulletins 78–3 and 78–6, and any other subsequent mandates on administration of psychotropic drugs, as well as their implementation of this order. The first report, covering the month of September 1979, shall be submitted on or before October 15, 1979, and each report shall be due by the 15th of the month thereafter during the period before a final order is entered.

G. Where this order specifically refers to voluntary patients, the order grants relief for that subclass, and where it specifically refers to involuntary patients it grants relief for that subclass. Where neither category is referenced, then relief is granted for both subclasses.

No preliminary injunction shall issue against defendants Pepernik, Wallis, Balita, Santos, Ivanov and Abraham.

No costs are awarded.