R.A.J., et al., Plaintiffs,

v.

**Gary E. MILLER, M.D., et al., Defendants,**

and

**United States of America, Amicus Curiae.**

**Civ. A. No. 3–74–0394–H.**

United States District Court, N.D. Texas, Dallas Division.

June 22, 1984.

Roger L. Gette, North Central Texas Legal Services, Inc., Dallas, Tex., Laura Smith, Texas Legal Services Center, Austin, Tex., for plaintiffs.

W. Kent Johnson, Texas Dept. of Mental Health & Mental Retardation, Philip Durst, Asst. Atty. Gen., Education and Civil Rights, Austin Div., Austin, Tex., for defendants.

Helen Brattin, David Van Os, Schwartz Waterman Fickman & Van Os, Houston, Tex., for Texas Employee Union Comm. Workers of America.

Andrew J. Barrick, Gleam O. Davis, U.S. Dept. of Justice, Civil Rights Div., Wash-

ington, D.C., for United States, amicus curiae.

David Pharis, Martha Boston, Dr. James Peden, R.A.J. Review Panel, Austin, Tex., for R.A.J. Review Panel Members.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

This case is before the Court on the Review Panel's ("Panel") Recommendation Number 24, which concerns the adoption of a proposed Commissioner's Rule governing the manner in which patient consent must be sought prior to the administration of psychotropic medications. The Panel filed its original Recommendation on January 16, 1984. Both Plaintiffs and Defendants objected.

After further Court-ordered negotiations, the parties concluded that they fundamentally disagreed over the right of an *involuntarily committed* patient to withhold consent to the administration of psychotropic medication. In the absence of an emergency, Plaintiffs would allow administration over the patient's objections only if it is deemed necessary after review *and* the patient lacks the present ability to appreciate the nature and consequences of his decision to object to the medication; a competent involuntarily committed patient would have the right to refuse treatment. Defendants would afford the involuntarily committed patient the right to have the treatment decision reviewed, and would provide an extra step in the review process if the patient is able to appreciate the nature and consequences of his decision; they would not, however, allow any involuntarily committed patient to refuse treatment.

Defendants filed their own Proposed Rule on March 21, 1984, which incorporates their position on the disputed issue. *See* Appendix. Plaintiffs' Proposed Rule, filed March 28, 1984, has been adopted by the Panel in its Statement filed May 31, 1984. Pursuant to this Court's Order of March 26, 1984, the parties have filed briefs in support of their respective positions. The United States filed its Recommendation and Memorandum on May 31, 1984; Plaintiffs and Defendants both filed their Briefs on June 1, 1984. In addition, the Court on June 1, 1984, granted leave to the Texas Medical Association to file an amicus curiae brief on this issue, which was received by the Court on June 11th.

After consideration of the aforementioned briefs, the authorities cited therein, and the Settlement Agreement, the Court is of the opinion, for the reasons discussed below, that Defendants' Proposed Rule should be accepted.

The portion of the Settlement Agreement ("Agreement") that governs this controversy provides that the proposed rule on patient consent "shall set forth standards to be used with respect to voluntary admissions, emergency admissions, temporary hospitalizations and indefinite commitments. The proposed regulation shall take into account, procedures and practices developed and mandated in the cases of *Rennie v. Klein*, 476 F.Supp. 1294 (D.N.J. 1979), and *Rogers v. Okin*, 634 F.2d 650 (C.A. 1, 1980)." Agreement, VI(B)(3).

Since the entry of the Agreement in April of 1981, there has been significant activity in both the *Rennie* and *Rogers* cases. *Rennie*, after an en banc decision by the Third Circuit, was vacated and remanded by the Supreme Court for further consideration in light of *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). *See Rennie v. Klein*, 653 F.2d 836 (3rd Cir.1981) (en banc), *vacated and remanded*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand*, 720 F.2d 266 (3rd Cir.1983) (en banc). Assuming that the *Youngberg* analysis also applied to the facts of *Rogers*, the Supreme Court vacated that decision as well, calling on the lower court to decide whether an intervening state court decision may have obviated the need to reach the federal question. *See Rogers v. Okin*, 634 F.2d 650 (1st Cir.1980), *vacated and remanded sub nom. Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

In *Youngberg,* the Supreme Court held that an involuntarily committed mentally retarded person has a fourteenth amendment liberty interest in safe conditions of confinement and freedom from bodily restraint. *Youngberg, supra,* 457 U.S. at 315–16, 102 S.Ct. at 2458. The Court found, however, that, under certain circumstances, legitimate state interests can override these individual rights. *Id.* at 320, 102 S.Ct. at 2460. The proper balance between individual rights and relevant state interests is achieved, and due process satisfied, as long as the restrictions on liberty are imposed by the exercise of professional judgment. *Id.* at 321, 102 S.Ct. at 2461. "It is not appropriate for the courts to specify which of the several professionally acceptable choices should have been made." *Id.* (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3rd Cir.1980) (Seitz, J., concurring)). The decision of a professional will be invalid only when it "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982). Any more stringent standard, the Court felt, "would place an undue burden on the administration of institutions ... and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents." *Id.* at 322, 102 S.Ct. at 2461.

The *Youngberg* court specifically addressed only the rights of an involuntarily committed *mentally retarded* individual to be free from *physical* bodily restraint. The language of the opinion, however, speaks more broadly to the larger class of all persons who have been involuntarily committed. *See id.* at 315–16, 102 S.Ct. at 2458; *Rennie v. Klein,* 720 F.2d 266, 273 n. 1 (3rd Cir.1983) (Seitz, J., concurring). The Court's action in vacating and remanding the *Rennie* decision for further consideration in light of *Youngberg,* moreover, evidences an intent to apply the guidelines of *Youngberg* to the right of an involuntarily committed *mentally ill* patient to refuse

*administration of psychotropic drugs.* Both the Second and Third Circuit Courts of Appeals have so applied the *Youngberg* guidelines. *See Project Release v. Prevost,* 722 F.2d 960, 980 (2nd Cir.1983); *Rennie v. Klein,* 720 F.2d 266, 269 (3rd Cir.1983) (en banc). *See also Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982). Therefore, it appears to the Court that resolution of the dispute surrounding Recommendation Number 24 should be governed by the principles enunciated in the *Youngberg* opinion. After examination of the *Prevost* and *Rennie* decisions, then, the Court will analyze Defendants' Proposed Rule in light of these *Youngberg* principles.

The New York State regulations at issue in *Prevost* provide for three levels of review of the medication decision by medical personnel other than the treating physician. *Prevost, supra,* 722 F.2d at 980. Without an in-depth examination of the review procedures, the Second Circuit in that case found that the regulations, on their face, satisfied due process. *Id.* at 981. In *Rennie,* all but one of the ten judges, writing in four separate opinions, found that the New Jersey procedures were similarly adequate in implementing the due process rights of the mentally ill. Judge Seitz, whose concurrence in *Romeo v. Youngberg,* 644 F.2d 147, 173 (3rd Cir.1980), was adopted by the Supreme Court, *see Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982), found that the New Jersey regulations satisfied the *Youngberg* professional judgment standard. In so finding, he referred to the requirement that:

> [T]he physician base his decision to administer the drugs on one of three alternative findings: (1) that the patient will harm himself or others without the drugs; (2) that the patient cannot improve without the drugs; or (3) that the patient can improve without the drugs, but only at a significantly slower rate.

*Rennie, supra,* 720 F.2d at 274. *See* New Jersey Administrative Bulletin ("Ad.Bull.") 78–3 § II(2). In addition, he relied on the

professional review system established by the regulations, which requires the physician to seek the approval of a treatment team if the patient withholds consent. *Rennie, supra,* 720 F.2d at 274. *See* Ad. Bull. § II(B) & (C). In the case of involuntarily admitted patients not adjudicated incompetent by a court, the decision to medicate must be submitted for further review to the medical director or his designee. *Rennie, supra,* 720 F.2d at 274; Ad.Bull. § II(D). In summary, Judge Seitz concluded:

> I have no doubt that the New Jersey scheme for administering antipsychotic drugs to unwilling patients satisfies the due process requirements adopted by the Supreme Court in *Youngberg.* The scheme not only requires that the decision be the product of a professional judgment, but it specifies in some detail the particular type of professional judgment that must be exercised. In addition, the scheme imposes certain procedural requirements to ensure the appropriateness of the decision.

*Rennie, supra,* 720 F.2d at 274.

Plaintiffs argue, in accordance with the views of Judges Garth, Aldisert and Hunter, that the *Rennie* holding should be restricted to only those mentally ill patients who constitute a danger to themselves or to others. *See id.* at 269. The Court does not agree. As the expression of only three out of the nine judges who concurred in the judgment, this limitation does not represent the opinion of the *Rennie* court. As Judges Adams and Becker pointed out, moreover, the restriction is essentially meaningless, because an individual cannot be involuntarily committed in New Jersey unless he is a danger to himself or to others. *Id.* at 272.

Nor does the Court agree with Plaintiffs that the analysis in *Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980), has binding application to the issue before this Court. That opinion, vacated and remanded by the Supreme Court in light of an intervening decision by the Massachusetts Supreme Court, relied heavily on the rather extensive body of statutory and common law of Massachusetts concerning the right of an individual to refuse medical treatment. *See id. See also Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982); *Rogers v. Commissioner of the Department of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983).

Turning now to the Commissioner's Rule proposed by Defendants, the Court is of the opinion that it adequately protects the rights of involuntarily committed patients in light of the standards enunciated in *Youngberg* and applied in *Rennie* and *Prevost.* The circumstances under which treatment with psychotropic medication is considered medically appropriate, outlined in Section 3(e) of Defendants' Proposed Rule, parallel those contained in the New Jersey Regulations upheld in *Rennie. See* Ad.Bull. § II(2). The factors that must be weighed in the exercise of professional judgment, delineated in Sections 4 and 8(b)(2) of Defendants' Proposed Rule, address the considerations outlined by Judge Seitz in *Rennie. See Rennie, supra,* 720 F.2d at 274. In addition, all patients are afforded a two tiered medical review process, which ensures that professional judgment will be exercised. Defendants' Proposed Rule, § 8(b)(1)–(4). *See Rennie, supra,* 720 F.2d at 274.

Finally, for an involuntarily committed patient who has been adjudged competent by the reviewing clinical director, the Defendants' Rule provides the right to even further review of the treatment decision by an independent consultant psychiatrist. Defendants' Proposed Rule, § 8(b)(6) & (7). With this added layer of due process protection for the competent, involuntarily committed patient, the Court is convinced that Defendants' Proposed Rule satisfies constitutional minimums.

Moreover, the Court does not find a basis in the applicable case law for an absolute right on the part of the competent involuntarily committed patient to refuse administration of psychotropic medications.

Involuntary confinement represents a transfer from the patient to the State of

the authority to make certain decisions affecting the patient's welfare .... The State is not restricted to helping the patient only if he wishes to be helped. That limitation was overcome when the patient was confined. The State may therefore make decisions about different treatments that offer some hope of improving the patient's condition and returning him to his community. *Rennie, supra,* 720 F.2d at 273 (Seitz, J., concurring). Nor does the Court find that due process requires a judicial determination of incompetency; the administrative determination required by the Defendants' Proposed Rule is sufficient. *United States v. Leatherman,* 580 F.Supp. 977, 980 (D.D. C.1983).

For all of the above reasons, the Court is of the opinion that Defendants' Proposed Rule satisfies the requirements outlined in the Agreement. The Court is in agreement with the United States, however, that a patient who withholds his consent must not be treated over his objections until the review process outlined in Defendants' Rule has been completed.

SO ORDERED.

## APPENDIX

### TDMHMR
### March 19, 1984

## PROPOSED COMMISSIONER'S RULE ON ADMINISTRATION OF PSYCHOTROPIC MEDICATIONS

### 1. PURPOSE

The purpose of these rules is to prescribe procedures to be followed in administering psychotropic medications to certain patients served by the Department and to assist in establishing therapeutic alliances between the patients and their treating physicians.

### 2. APPLICATION

These rules apply to all patients admitted to state mental health facilities.

### 3. DEFINITIONS

The following words and terms shall have the following meanings for the purpose of this Rule unless the context clearly indicates otherwise:

(a) "Emergency" means a situation which, in the opinion of the treating physician, indicates the possibility of immediate physical or mental deterioration of the patient, or indicates the possibility of immediate physical injury or death of the patient or other persons in the facility;

(b) "Informed consent" means consent given by a person admitted to a mental health facility under the voluntary, emergency or OPC provisions of Texas statutes when each of the following conditions have been met:

(1) legal capacity: The person giving the consent is an adult or is a voluntarily admitted patient aged 16 or over, and has not been adjudicated incompetent to manage his personal affairs by an appropriate court of law;

(2) receipt of information: The person giving the consent has been informed of the nature, purpose, risks, and benefits of treatment with psychotropic medication, as well as generally accepted alternatives to such treatment, if any; and

(3) voluntariness: The consent has been given voluntarily.

(c) "Committed patient" means a patient committed to a mental health facility under the temporary hospitalization, indefinite hospitalization, or court ordered inpatient provisions of Texas statutes.

(d) "Legally authorized representative" means the parent, managing conservator or guardian of a minor; or the guardian of the person of an adult;

(e) "Medically appropriate treatment" means treatment with psychotropic medication based on a professional judgment that without such medication the patient's condition cannot realistically be expected to improve within a reasonable period of time; or that without such medication deterioration of the patient's condition cannot be prevented; or that with-

out such medication there is a significant possibility that the patient's mental condition will not be stabilized in time to prevent injury to himself or other persons;

(f) "Mental health facility" means all state mental hospitals;

(g) "Minor" means a person under 18 years of age who is not and has not been married or who has not had his disabilities of minority removed for general purposes. A person 16 or 17 years of age who has voluntarily admitted himself to a mental health facility is not considered to be a minor.

(h) "Psychotropic medication" means therapeutic agents of a chemical nature used in the treatment of mental illness which have the property of reducing or eliminating the signs, symptoms and disabling consequences of mental illness.

## 4. INFORMATION REQUIRED TO BE GIVEN

(a) Before administering psychotropic medication to any patient in a mental health facility, the treating physician shall explain to the patient and/or to the patient's legally authorized representative, if the representative is available, the following in simple, non-technical language (this explanation may be given by the nurse if the treating physician cannot be present, but the treating physician must confirm the explanation with the patient and/or his legally authorized representative, if the representative is available, within six calendar days):

(1) the nature of the patient's mental illness and condition;

(2) the beneficial effects on the patient's mental illness and/or condition expected as a result of treatment with the medication;

(3) the probable consequences to the patient of not taking the medication including, as appropriate:

(A) unnecessarily prolonged hospital stays;

(B) repeated hospital admissions;

(C) deterioration in the patient's family, social or work adjustment; and

(D) the occurrence or reoccurrence of frightening, painful, or incapacitating signs and symptoms of mental illness;

(4) the existence of generally accepted alternative forms of treatment, if any, that could reasonably be expected to achieve the same benefits as the medication;

(5) a description of the proposed course of treatment with the medication;

(6) the fact that side effects of varying degrees of severity are a risk of all medications;

(7) the side effects of the medication, including:

(A) any side effects which are known to frequently occur in most patients;

(B) any side effects to which the particular patient may be predisposed; and

(C) the nature and possible occurrence of the potentially irreversable symptoms of tardive dyskinesia in some persons taking neuroleptic medications in large dosages and/or over long periods of time;

(8) the need to advise mental health facility staff immediately if any of these side effects occurs; and

(9) the patient's rights under this rule.

## 5. WHO MAY GIVE INFORMED CONSENT

Informed consent to administer psychotropic medications may be given by the legally authorized representative of a patient admitted under the voluntary, emergency or OPC provisions of Texas statutes, or by such a patient himself if he meets the criteria described in Section 3(b), above. Persons who have admitted themselves under the voluntary provisions of Texas statutes are presumed to have the legal capacity to consent.

## 6. DOCUMENTATION OF INFORMED CONSENT

(a) Informed consent for the administration of psychotropic medication will be evi-

denced by a copy of the Department's form for consent to treatment-therapy-surgical procedure (see attachment) executed by a patient admitted under the voluntary, emergency or OPC provisions of Texas statutes or his legally authorized representative. This executed form will establish a rebuttable presumption of valid consent and will be retained in the patient's record. Any time the medication regimen is altered in a way which would result in a significant change in the risks or benefits for the patient, an explanation of the change will be provided to the patient.

(b) If such a patient or his legally authorized representative consents to the administration of psychotropic medication but refuses or is unable to execute the form, the treating physician will document the consent in the patient's record.

(c) The treating physician will discuss the administration of psychotropic medication with all patients for whom such medication has been prescribed, will provide to them the explanation described in Section 4 and will attempt to create a therapeutic alliance with each patient.

## 7. PATIENTS ADMITTED UNDER TEXAS STATUTES

Psychotropic medications will not be administered to patients admitted to a mental health facility under the voluntary, emergency or OPC provisions of Texas statutes without informed consent, except as provided in Section 10 below.

## 8. PATIENTS COMMITTED UNDER TEXAS STATUTES

(a) The decision to administer psychotropic medication to a committed patient during the first fourteen (14) days of his commitment is within the discretion of the treating physician. The prescription of such medications is governed by the provisions of Chapter 405 Subchapter GG of the Department's Rules.

(b) If, following the initial fourteen (14) day period, a committed patient or his legally authorized representative objects to the administration of psychotropic medication, the facility should consider discharging the patient. If discharge is not appropriate, the medication may be continued; but the following review procedure will be initiated:

(1) The clinical director of the mental health facility or his physician designee who does not work on the patient's unit, will, within six (6) calendar days of the patient's objection or that of his legally authorized representative, personally examine the patient, interview him and his legally authorized representative, if the representative is available, review his records, discuss the case with the treating physician and make a determination concerning the appropriateness of treatment with psychotropic medication.

(2) The administration of psychotropic medication may be continued if the Clinical Director or his physician designee determines that the administration of such medication is medically appropriate treatment. In making this determination, the clinical director or his physician designee will consider the following factors:

(A) the accuracy of the diagnosis;

(B) indications for the medication;

(C) probable benefits and risks of the medication; and

(D) the existence and value of alternative forms of treatment, if any.

(3) In addition, the clinical director or his physician designee will make a determination as to whether the patient's ability to understand the consequences of his decision to object to the administration of such medication is impaired as a result of his mental illness.

(4) If, at any time, the clinical director or his physician designee determines that the administration of a psychotropic medication is *not* medically appropriate treatment, the administration of such medication will be discontinued within a reasonable period of time following that determination if the patient or his legally authorized representative con-

tinues to object. The period of time within which the medication must be discontinued will be based on the condition of the patient and the type and dosage of medication being administered.

(5) If the administration of psychotropic medication is continued pursuant to a determination under Section 8(b)(2), above, the Clinical Director or his physician designee will personally monitor the patient's progress on a monthly basis to determine whether the administration of psychotropic medication continues to be medically appropriate treatment.

(6) If the clinical director or his physician designee determines that the administration of psychotropic medication is medically appropriate treatment but also determines that the patient's ability to understand the consequences of his decision to object to the administration of such medication has *not* been impaired as a result of his mental illness, the head of the mental health facility will ensure that a consultant psychiatrist not employed by the TDMHMR will, within six (6) calendar days, personally examine the patient, interview him and his legally authorized representative, if the representative is available, review his records, discuss the case with the treating physician and with the clinical director or his physician designee and make a determination concerning the appropriateness of treatment with psychotropic medication. The provisions of this section will also apply to those situations in which the decision to object was made by the committed patient's legally authorized representative.

(7) If the consultant psychiatrist determines that treatment with psychotropic medication is medically appropriate treatment, the administration of such medication may be continued, but the clinical director or his physician desig-

nee will monitor the patient's progress as described in Section 8(b)(5), above.

(c) Within twelve (12) months of the effective date of this rule, all patients who have been in a mental health facility under an order of commitment for a period longer than fourteen (14) days will be reviewed to determine whether such patients object to the administration of psychotropic medications and, if so, whether it is medically appropriate treatment.

## 9. DOCUMENTATION

Each step of the procedure described in this Rule will be clearly documented in the patient's record.

## 10. EMERGENCIES

Nothing herein is intended to preclude the administration of psychotropic medication to any patient in an emergency as defined herein.