573 A.2d 809

**Laquinn K. WILLIAMS**

v.

**Adele W. WILZACK et al.**

**No. 140, Sept. Term, 1988.**

Court of Appeals of Maryland.

May 29, 1990.

Motion for Reconsideration Denied June 25, 1990.

Cathy S. Surace (Andrew S. Penn, Linda Potter, all on brief), Upper Marlboro, for appellant.

Susan Goering, Baltimore, Arthur Spitzer and Elizabeth Symonds, Washington, D.C., Robert Plotkin, Sheila Kraft Budoff, Laxalt, Wash., Perito & Dubuc, Washington, D.C., amicus curiae, for American Civil Liberties Union of Mary-

land and American Civil Liberties Union of the Nat. Capital Area.

Susan Sugar Nathan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Janet Klein Brown, Sp. Atty., all on brief), Baltimore, for appellees.

Varda N. Fink of Baltimore, amicus curiae, for Johns Hopkins Hosp. Inc. and The Maryland Psychiatric Soc., Inc.

John R. Metz and Piper & Marbury, Baltimore, amicus curiae, for Chestnut Lodge Hosp., Inc.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

MURPHY, Chief Judge.

This case involves a challenge to the constitutionality of Maryland statutes governing the forcible administration of antipsychotic medication to involuntarily committed mental patients in non-emergency situations.

## I.

Maryland Code (1982, 1988 Cum.Supp.), Subtitle 7 of Title 10 of the Health–General Article is entitled, "Rights of Mentally Ill Individuals in Facilities." Section 10–701(c) of the subtitle provides that each mentally ill individual in a psychiatric facility is entitled to receive "appropriate humane treatment and services in a manner that restricts the individual's personal liberty within a facility only to the extent necessary and consistent with the individual's treatment needs and applicable legal requirements." Among other "rights" provided to mentally ill individuals involuntarily confined in psychiatric institutions, this subsection requires that they receive treatment in accordance with an "individualized" treatment or rehabilitation plan. Section

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

10–701(f) requires that mentally ill individuals in psychiatric facilities "be informed of the rights provided in this subtitle in language and terms that are appropriate to the individual's condition and ability to understand." Paragraph (2) of this subsection directs that the institution post notices in locations accessible to the individual and to visitors describing the rights of the mentally ill individual; and subsection (g) directs that the facility implement a complaint procedure "that affords an individual the ability to exercise the rights provided in this subtitle."

Section 10–702 directs that confined mentally ill individuals be afforded access to a telephone; to writing instruments, stationery and postage. Section 10–703 directs that these persons are entitled to converse privately with and receive visits from lawyers, clergymen, or other visitors. Section 10–706 requires that the treatment or rehabilitation plan for the mentally ill individual be in writing, that the nature, content and objectives of the plans be communicated to the patient, that the patient be permitted to participate in the development of the plans, and that the patient be advised of the "nature and significant possible adverse effects of recommended treatment." Section 10–706(c)(2)(iii) and (iv) further requires that the individual be informed of the "name, title, and role of personnel directly responsible for carrying out the treatment for the individual" and, when appropriate, "other available alternative treatments."

Section 10–708(a) authorizes a mentally ill individual in a psychiatric institution "to refuse medication used for the treatment of a mental disorder," except in two instances:

"(1) When the medication is provided on the order of a physician in an emergency where the individual presents a danger to the life or safety of the individual or others; or

(2) In nonemergency situations, where the individual is hospitalized involuntarily or by order of a court and the medication is approved by a clinical review panel."

The remaining provisions of § 10–708 outline the composition of the clinical review panel and the procedures to be followed in the panel's decision whether to forcibly medicate a patient. Section 10–708(b) requires that the panel be comprised of (1) the clinical director of the facility, if a physician, or a physician designated by the clinical director; (2) a psychiatrist; and (3) a nonphysician mental health care provider. This subsection also provides that if a member of the panel is directly responsible for implementing the patient's treatment plan, a different panel member shall be designated by the clinical director. Subsection (c) of § 10–708 directs that the panel, in determining whether to approve the medication:

"(i) Review the individual's clinical record;

(ii) Consult with facility personnel who are responsible for implementing the individual's treatment plan;

(iii) Consult with the individual regarding the reasons for refusing the medication;

(iv) Review the individual's capacity to make decisions concerning treatment; and

(v) Review the potential consequences of requiring the individual to accept the medication and of withholding the medication from the individual."

Section 10–708(c)(2) also directs that the panel "may not approve the medication where there are alternative treatments that are acceptable to both the individual and facility personnel who are directly responsible for implementing the individual's treatment plan." Section 10–708(c)(3) prohibits the panel from approving the use of the medication for more than a sixty-day period and further provides that, after that period, if the patient refuses the medication, it may be continued only if again approved by the panel every sixty days.

## II.

Laquinn Williams is a patient at the Clifton T. Perkins Hospital Center, a psychiatric institution operated by the Maryland State Department of Health and Mental Hygiene

(DHMH). His diagnosis is schizophrenia: paranoid type. He was first committed to Perkins in October of 1986 for an evaluation of his competence to stand trial on criminal charges of second degree attempted rape and battery. After being found competent to stand trial, Williams pleaded and was subsequently adjudicated in the Circuit Court for Montgomery County as not criminally responsible under Code (1988 Cum.Supp.), § 12–108 of the Health–General Article. That section provides that

"[a] defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

(a) To appreciate the criminality of that conduct; or

(b) To conform that conduct to the requirements of law."

For purposes of applying the provisions of this section, a "mental disorder" is defined in § 12–101 of the Article to mean

"a behavioral or emotional illness that results from a psychiatric or neurological disorder.

(2) 'Mental disorder' includes a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another."

As a result of the verdict that Williams was not criminally responsible for his criminal conduct, he was committed, pursuant to the provisions of § 12–111(a) of the Health–General Article, to Springfield Hospital Center, a State psychiatric institution "for institutional, inpatient care or treatment." Section 12–113 provides that an individual so committed may be released, conditionally or otherwise, only if the individual "would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged."

In July, 1987, Williams's treating psychiatrist, Dr. Abbas, prescribed Mellaril, an antipsychotic drug. Williams refused to take the medication, apparently based on his fear of its side effects and of its power to disrupt his thought processes. He claimed that the drug would interfere with the exercise of his Sunni Muslim religion, which required him to recite prayers from memory five times a day. He also asserted that the drug would interfere with his ability to assist his attorney at a subsequent release hearing, as authorized by § 12–113 of the Health–General Article.

Dr. Abbas requested a review of Williams' decision to refuse the medication by a clinical review panel. The panel was convened on August 10, 1987; the case was presented to it by Williams' treating psychiatrist, Dr. Abbas, and by two other members of the treatment team. Williams and his lawyer were present for that part of the panel hearing, at which Williams explained his reasons for refusing to take the drug. The panel reviewed Williams's treatment record. It described him as "moderately hostile and suspicious" and found that his mental illness prevented him from making a rational decision regarding medication. It also found that Mellaril was the least intrusive type of effective treatment and that without it Williams would likely regress and become more hostile. The panel unanimously determined that Williams should be required to take the medication notwithstanding his objections.

Williams was forcibly medicated from August 19 or 20, 1987 (the parties disagree about the exact date) until September 5, 1987, when he expressed his intention to obtain an *ex parte* injunction against forcible medication. The State agreed at this time to temporarily discontinue forced medication and to convene a second clinical review panel.

On September 15, 1987, a second panel was convened at Perkins. It consisted of the clinical director, a psychiatrist

and a nurse.[1]   A presentation was made by Dr. Ellen McDaniel, a psychiatrist privately engaged by Williams who had evaluated him during the time period between the two panel meetings.   Dr. McDaniel testified that Williams made a rational decision in refusing to take the drugs, that he need not be forcibly medicated, and that he could be effectively treated with less intrusive therapies.

The second panel also unanimously recommended that Williams be medicated over his objection.   It found that Williams's symptoms precluded his ability to make rational treatment decisions, and that his "high degree of suspicion" would prevent him from profiting from any of the "talking therapies" recommended by Dr. McDaniel.   The panel stated that Williams's belief that staff members were "fabricating" issues about him, and his inability to relate to staff," made medication "the most appropriate type of intervention compatible with this patient's well being."   The panel concluded that medication might improve Williams's mental status and make him more amenable, in the future, to other types of therapy.   To withhold treatment, the panel said, "will lengthen the time of hospitalization, maintain the barrier to relating with others, and perhaps allow Mr. Williams to further disintegrate."

On September 16, 1987, Williams filed an action in the Circuit Court for Montgomery County, alleging that forcible administration of antipsychotic drugs under the procedures of § 10–708 violated his state and federal constitutional rights to privacy, due process, freedom of speech, thought, and religion.   He sought preliminary and permanent injunctive relief to prohibit future forcible medication.   He also requested compensatory and punitive damages.   Pending decision on the merits of the case, the State agreed not to forcibly medicate Williams except in an emergency.[2]

---

1. Neither of the panels included a member of Williams's treatment team.

2. Williams sued several state officials and employees, including Adele Wilzack, R.N., Secretary of the Maryland DHMH, Henry Harbin,

On April 22, 1988, Williams filed an amended complaint, adding an equal protection claim. The State thereafter filed motions for summary judgment as to Williams's constitutional and other claims. Williams filed a motion for partial summary judgment on the ground that § 10–708 on its face violates substantive and procedural due process and the equal protection guarantees of the Maryland Declaration of Rights and the United States Constitution.

On July 26, 1988, the court (Beard, J.) denied Williams's motion for partial summary judgment, holding that § 10–708 did not on its face violate Williams's constitutional rights. The court granted the State's motions for summary judgment, holding that it acted in compliance with § 10–708 and that its conduct under the statute did not violate any of Williams's constitutional rights. The court did not issue a written opinion.

Williams appealed. We granted certiorari before decision by the Court of Special Appeals to consider the important issues raised in the case.

### III.

Williams argues that under both the State and Federal Constitutions, a competent person has a protected right to make his or her own treatment decisions. He does not challenge the state's right to forcibly medicate an involuntarily committed psychiatric patient in an emergency situation, but contends that absent an emergency, a competent person may not be forced to take antipsychotic drugs. Given the dangerous side effects associated with these drugs, Williams maintains that their forcible administration impinges upon his first amendment rights; upon his fourteenth amendment liberty interest; and upon his right of privacy secured by the fourth, fifth, and fourteenth amend-

M.D., Director of the Mental Hygiene Administration, Stuart Silver, M.D., Superintendent of the Clifton T. Perkins Hospital Center, and Jose Gelpi, M.D., Clinical Director of Perkins. We will refer to the defendants collectively as the State.

ments. He argues that these rights cannot be abridged in the absence of a compelling state interest.

While conceding that the State has a *parens patriae* interest in caring for those who cannot care for themselves, Williams contends that this interest has no application unless the patient is adjudged incompetent. Nor is it sufficient to satisfy constitutional requirements, according to Williams, that the clinical review panel is required to "review the individual's capacity to make decisions concerning treatment" as one statutory factor in making its decision. Williams points out that involuntary commitment under Maryland law is not tantamount to an adjudication of incompetency, and therefore does not warrant a presumption that the patient is incompetent.[3]

Williams also argues that due process under the Federal Constitution, and Article 24 of the Maryland Declaration of Rights, requires a judicial proceeding to determine the patient's competence before antipsychotic drugs may be forcibly administered.[4] This is so, he suggests, because among other reasons institutional employees have inherent conflicts of interest which limit their ability to render a fair and unbiased decision. He contends that § 10–708 is also defective because it fails to provide certain important rights to the involuntarily committed competent patient: the right to notice of the place and time of the panel meeting, the right to counsel at the meeting, the right to attend the meeting, the right to hear evidence and to question witnesses, the right to a written decision, and the right to appeal the panel's determination.

---

3. *See* §§ 10–632, 12–104, 12–105 and 12–111 of the Health–General Article, which control both civil and criminal involuntary commitment.

4. Article 24 provides:
"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

The State argues that § 10–708 fully complies with the due process guarantees of the State and Federal Constitutions. It contends that an adversarial judicial proceeding is not required to satisfy due process requirements as long as professional medical judgment is exercised in the decision to override the patient's refusal of antipsychotic drugs. The State suggests that the judicial process does not offer any better protection against error than a decision by competent medical professionals. Moreover, it contends that § 10–708 is constitutional in all respects, whether or not the involuntarily committed patient has been adjudicated as legally incompetent.

The State further contends that Article 24 of the Maryland Declaration of Rights and the fourteenth amendment of the Federal Constitution are *in pari materia* and therefore bear the same construction. Consequently, it maintains that the professional judgment due process standard satisfies the requirements of Art. 24, and that § 10–708 does not violate Williams's first amendment rights or deny him equal protection of the law.

## IV.

Under Maryland common law, "a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient." *Sard v. Hardy*, 281 Md. 432, 439, 379 A.2d 1014 (1977). By enacting § 10–708, the General Assembly changed the common law by legislating a narrow exception to permit nonconsensual medication of a patient involuntarily committed by court order to a psychiatric facility when the medication is approved by a clinical review panel of health care professionals consistent with statutorily prescribed criteria.

A number of courts have concluded that although the forcible administration of antipsychotic drugs to an involuntarily committed psychiatric patient implicates a constitu-

tionally protected liberty interest in bodily integrity, due process considerations may be satisfied if professional medical judgment is exercised in making the determination to override the patient's refusal to take the drug. *See, e.g., United States v. Charters,* 863 F.2d 302 (4th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Dautremont v. Broadlawns Hospital,* 827 F.2d 291 (8th Cir.1987); *Johnson v. Silvers,* 742 F.2d 823 (4th Cir. 1984); *Rennie v. Klein,* 720 F.2d 266 (3rd Cir.1983); *Project Release v. Prevost,* 722 F.2d 960 (2nd Cir.1983); *Stensvad v. Reivitz,* 601 F.Supp. 128 (W.D.Wis.1985); *R.A.J. v. Miller,* 590 F.Supp. 1319 (N.D.Texas 1984); *United States v. Leatherman,* 580 F.Supp. 977 (D.D.C.1983); *Large v. Superior Court,* 148 Ariz. 229, 714 P.2d 399 (1986). In so holding, these courts placed reliance upon the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, decided on June 18, 1982.

The question presented in *Youngberg* was whether an individual involuntarily committed to a state institution for the mentally retarded had substantive rights under the due process clause of the fourteenth amendment to (1) safe conditions of confinement, (2) freedom from bodily restraints, and (3) training necessary to secure these interests. In an action under 42 U.S.C. § 1983 (1979), damages were claimed on behalf of the patient for breach of these alleged constitutional rights. The Court held that patients involuntarily committed to a state mental institution possess a liberty interest protected by the due process clause in safe conditions of confinement, freedom from unreasonable bodily restraints, and minimally adequate training to insure these protected rights. The Court said that these liberty interests were not absolute but were subject to operational necessities of the institution. In determining whether a substantive right protected by the due process clause has been violated, the Court said it was necessary to balance the liberty of the individual and the demands of an organized society. 457 U.S. at 320, 102 S.Ct. at 2460.

In striking this balance, the Court said that its cases have "weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* It then focused upon "the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded." *Id.* at 321, 102 S.Ct. at 2461. As to this, the Court, in considering the legitimate interest of the State and the rights of the involuntarily committed patient to reasonable conditions of safety and freedom from unreasonable restraints, concluded that courts are only required to make certain that professional judgment in fact was exercised. *Id.* at 321, 102 S.Ct. at 2461. It was not for courts, it said, to specify which of several professionally acceptable choices should have been made. In recognizing a due process right to minimally adequate training to insure safety and to facilitate the patient's ability to function free from bodily restraints, it required that the right be "reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraint." *Id.* at 322, 102 S.Ct. at 2461. In determining what was "reasonable," the Court directed that judges "must show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. In so circumscribing judicial review, the Court quoted from *Parham v. J.R.*, 442 U.S. 584, 608, n. 16, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) that courts, when reviewing medical decisions made by professionals, must " 'design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems.' " *Id.* at 322, n. 29, 102 S.Ct. at 2461, n. 29. In this respect, the Court said that "there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id.* at 322–23, 102 S.Ct. at 2462. In these circumstances, it announced that decisions made by a professional are presumptively valid, to be overruled "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or

standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462. The Court concluded that involuntarily committed patients could be restrained to the extent professional judgment deemed necessary to insure safety or to provide needed training. *Id.* at 324, 102 S.Ct., at 2462.

In *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16, decided the same day as the *Youngberg* case, the question before the Supreme Court was "whether involuntarily committed mental patients have a constitutional right to refuse treatment with antipsychotic drugs," 457 U.S. at 293, 102 S.Ct. at 2445, a question which the Court said "had both substantive and procedural aspects." [5] *Id.* at 299, 102 S.Ct. at 2448. There, suit for money damages was filed against officials of a Massachusetts state hospital by mental patients who, during their period of institutionalization, had been forced to accept unwanted treatment with antipsychotic drugs.

The Court in *Mills* "assumed" that the Constitution recognizes a liberty interest in avoiding an unwanted administration of antipsychotic drugs. *Id.* at 299, 102 S.Ct. at 2448. The substantive issue, it said, "involves a definition of that protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it," citing *Youngberg, supra.* The Court identified the procedural issue as concerning "the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance," citing *Parham, supra,* 442 U.S. at 606, 99 S.Ct. at 2506, and *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court said that while, "[i]n theory a court might be able to define the scope of a patient's federally protected liberty interest without refer-

---

**5.** The Court observed that "antipsychotic drugs" are medications such as Thorazine, Mellaril, Prolixin, and Haldol that are used in treating psychoses, especially schizophrenia. *Mills v. Rogers,* 457 U.S. at 293, n. 1, 102 S.Ct. at 2445, n. 1.

ence to state law," both the substantive and procedural issues were "intertwined with questions of state law which, for purposes of determining actual rights and obligations, could not be avoided." *Id.* It explained:

"Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution. If so, the broader state protections would define the actual substantive rights possessed by a person living within that State.

"Where a State creates liberty interests broader than those protected directly by the Federal Constitution, the procedures mandated to protect the federal substantive interests also might fail to determine the actual procedural rights and duties of persons within the State. Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law. Moreover, a State may confer *procedural* protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State." 457 U.S. at 300, 102 S.Ct. at 2448 (italics in original) (citations omitted).

In view of these considerations, the Court declined to decide the issue presented to it because, after its grant of certiorari, the Supreme Judicial Court of Massachusetts in *Guardianship of Roe*, 383 Mass. 415, 421 N.E.2d 40 (1981) held that the common law of Massachusetts, as well as the Federal Constitution, required that the liberty interest of a noninstitutionalized mental patient to refuse treatment with antipsychotic drugs was of such importance that it could be overcome only by "an overwhelming State interest." 383

Mass. at 434, 421 N.E.2d 40. This was so, the Court held in
*Roe,* even if the patient was adjudged incompetent in which
event the individual was entitled to have "substituted"
judgment exercised on his behalf and a judicial determina-
tion made before drugs could be administered in an non-
emergency situation. Because the Supreme Court was un-
certain whether the state court in *Roe* recognized liberty
interests greater than those minimally protected by the
Federal Constitution, it remanded the case to determine the
nature and scope of the protections afforded by state law.

In *Washington v. Harper,* —— U.S. ——, 110 S.Ct. 1028,
108 L.Ed.2d 178, decided February 27, 1990, the question
presented was whether, consistent with the protections af-
forded by the Due Process Clause of the Fourteenth
Amendment, "a judicial hearing is required before the State
may treat a mentally ill prisoner with antipsychotic drugs
against his will." —— U.S. ——, ——, 110 S.Ct. 1028, 1032,
108 L.Ed.2d 178. The prisoner was confined to a special
unit within the penal institution which treated inmates with
serious mental disorders. The inmate refused to take anti-
psychotic drugs which a psychiatrist deemed essential to his
treatment. A written state administrative policy governed
the forcible administration of drugs to a prisoner against
his will; it contained both substantive and procedural com-
ponents. First, it provided that if a psychiatrist determined
that a drug should be administered and the inmate did not
consent, he could be involuntarily medicated with the drug
only if he (1) suffered from a "mental disorder" and (2) was
"gravely disabled" or posed a "likelihood of serious harm"
to himself, others or their property. Second, the policy
provided that if the inmate refused to take the medication,
he is entitled to a hearing before a special committee
consisting of a psychiatrist, psychologist and an associate
superintendent of the institution, none of whom were in-
volved in the inmate's treatment or diagnosis. The policy
specified that if the committee determined by majority vote
that the inmate suffered from a mental disorder and was
gravely disabled or dangerous, he could be medicated

against his will, provided the psychiatrist was in the majority.

The state administrative policy afforded a number of procedural rights to the inmate. It required that the inmate be given at least twenty-four hours advance notice of the institution's intent to convene an involuntary medication hearing and that the inmate be notified of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believed that the medication was necessary. The administrative policy also provided that the inmate had a right to attend the hearing; to present evidence, including witnesses; to cross-examine staff witnesses, and to the assistance of a lay advisor who understood the psychiatric issues involved. The policy also required that minutes of the hearing be kept and a copy provided to the inmate. And the inmate was given a right to appeal the committee's decision to the institutional superintendent and, if unsuccessful, to obtain judicial review of the decision that he be involuntarily medicated with an antipsychotic drug.

After the committee found that the inmate was a danger to others as a result of a mental disorder, and should be involuntarily medicated, the inmate initiated a series of legal proceedings, culminating in a state court action under 42 U.S.C. § 1983 (1979), claiming that the failure to provide a judicial hearing violated the due process, equal protection and free speech clauses of the State and Federal Constitutions, as well as state tort law. The Supreme Court of Washington ultimately concluded that, consistent with due process requirements, "the State could administer antipsychotic medication to a competent, nonconsenting inmate only if, in a judicial hearing at which the inmate had the full panoply of adversarial procedural protections, the State proved by 'clear, cogent and convincing' evidence that the administration of antipsychotic medicine was both necessary and effective for furthering a compelling state interest." *State v. Harper*, 110 Wash.2d 873, 759 P.2d 358, 364–65 (1988).

In reversing the state court judgment, the Supreme Court first recognized that procedural protections must be exam-

ined in terms of the substantive rights at stake. —— U.S. at ——, 110 S.Ct. at 1036. Op. at 8. The substantive issue, it said, "is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will"; the procedural issue "is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient." *Id.*

The Supreme Court said that the state's administrative policy "undoubtedly confers upon [the inmate] a right to be free from the arbitrary administration of antipsychotic medication." *Id.,* —— U.S. ——, 110 S.Ct. at 1036. It noted that the administrative policy created "a justifiable expectation on the part of the inmate that the drugs will not be administered" unless he is found to be (1) mentally ill and (2) gravely disabled or dangerous. *Id.,* Citing *Youngberg, supra,* 457 U.S. at 316, 102 S.Ct. at 2458, the Court recognized that the inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* But it said that the extent of a prisoner's constitutional right must be defined in the context of his confinement; that the administrative policy required the state to establish, by a medical finding, that a mental disorder exists which is likely to cause harm if not treated; and that the fact that the drug must first be prescribed by a psychiatrist ensures that the treatment will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his confinement. *Id.,* —— U.S. at ——, 110 S.Ct. at 1036–37. These standards, the Court said, recognized both the prisoner's medical interest and the state's interest and comported with the demands of the due process clause. *Id.,* —— U.S. at ——, 110 S.Ct. at 1036–37.

The Court next noted that institutional regulations alleged to infringe constitutional rights must be judged under a "reasonableness" test, one less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. It said that there must be a valid, rational connection between the prison regulation and the

legitimate governmental interest put forward to justify it. *Id.,* —— U.S. at ——, 110 S.Ct. at 1037. The Court observed that the state has the obligation to provide prisoners with medical treatment consistent not only with their own medical interests but also with the needs of the institution, including measures for the prisoners' own safety. *Id.,* —— U.S. at ——, 110 S.Ct. at 1038. The Court was satisfied that the state administrative policy was a rational means of furthering the state's legitimate objectives of administering drugs for treatment purposes under the direction of a licensed psychiatrist. *Id.,* —— U.S. at ——, 110 S.Ct. at 1039. It took cognizance of the debate over the potential side effects of antipsychotic medications, as to which it remarked that "there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." *Id.,* —— U.S. at ——, 110 S.Ct. at 1039.[6]

The Court held that in the circumstances the Due Process Clause permitted the state "to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or

---

6. The Court recognized that antipsychotic drugs "can have serious, even fatal, side effects." Op., —— U.S. at ——, 110 S.Ct. at 1041. One such side effect, it observed, was acute dystonia, a severe involuntary spasm of the upper body, tongue, throat or eyes, which may be treated and reversed within a few minutes through use of a counteracting drug. Other side effects, according to the Court, include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, a neurological disorder, irreversible in some cases, that is characterized by involuntary uncontrollable movements of various muscles, especially around the face. *Id.,* —— U.S. at ——, 110 S.Ct. at 1041.

The Court took note of the sharp disagreement among professionals concerning the frequency with which tardive dyskinesia occurs, its severity, and the medical profession's ability to treat, arrest, or reverse the condition. The Court believed from a "fair reading" of the evidence in the case before it that the proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25% and that studies of the condition indicated that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe. *Id.,* —— U.S. ——, 110 S.Ct. at 1041.

others and the treatment is in the inmate's medical interest." *Id.,* —— U.S. at ——, 110 S.Ct. at 1039–40. As to the procedural protections necessary to insure that the decision to medicate involuntarily is neither arbitrary nor erroneous, the Court held that a judicial hearing was not required before the state could administer antipsychotic drugs against an inmate's will. *Id.,* —— U.S. at ——, 110 S.Ct. at 1040. In so concluding, the Court recognized that "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," since the purpose of the drugs "is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial [to the individual's] cognitive processes." *Id.,* —— U.S. at ——, 110 S.Ct. at 1041.

The Court said that notwithstanding the risks involved to the inmate, his interests were adequately protected "by allowing the decision to medicate to be made by medical professionals rather than a judge." *Id.,* —— U.S. at ——, 110 S.Ct. at 1042. It stated that nothing in the Constitution prohibited the state from permitting medical personnel to make that decision "under fair procedural mechanisms." *Id.* As to this, the Court held that the risks associated with antipsychotic drugs "are for the most part medical ones, best assessed by medical professionals," *id.,* —— U.S. at ——, 110 S.Ct. at 1042; and it was unwilling "to presume that members of the staff lack the necessary independence to provide an inmate with a full and fair hearing in accordance with the [administrative] policy." *Id.,* —— U.S. at ——, 110 S.Ct. at 1043.

In holding that due process did not require that the inmate be afforded a judicial hearing, the Court explained that the state administrative policy provided for notice, the right to be present at the adversarial hearing, and to present and cross-examine witnesses. *Id.,* —— U.S. at ——, 110 S.Ct. at 1043–44. It found that the adversarial hearing before the committee need not be conducted in accordance with the rules of evidence or that a "clear, cogent and convincing" standard of proof was required. It concluded that due process did not require that an inmate be repre-

sented by counsel; that it was less than clear "why *lawyers* must be available to identify possible errors in *medical* judgment." *Id.,* —— U.S. at ——, 110 S.Ct. at 1044 (italics in original). It said that an independent lay advisor who understands the psychiatric issues involved afforded sufficient constitutional protection to the inmate. It also commented that the inmate could obtain judicial review of the committee's decision under existing state law by way of a personal restraint petition or a petition for an extraordinary writ. And, finally, in holding that the state's administrative policy was permissible under the Constitution, the Court characterized the policy in these words, *id.,* —— U.S. at ——, 110 S.Ct. at 1044:

> "It is an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others."

Prior to its decision in *Harper,* the Supreme Court granted a stay of the judgment in *United States v. Charters,* 863 F.2d 302 (4th Cir.1988) (en banc), pending its review of a certiorari petition filed in that case. In *Charters,* the government sought an order to forcibly medicate an involuntarily committed mentally ill patient who had earlier been declared incompetent to stand trial for a federal crime. The patient had been found to be dangerous to himself and others and was committed for continuing evaluation and treatment to a federal psychiatric facility. He refused to take antipsychotic drugs prescribed for him by a psychiatrist, claiming that the use of antipsychotic drugs without his consent, or a judicial determination of his incompetence, impinged upon his constitutionally protected liberty interests. At a subsequent hearing before a federal district judge to determine if the patient should be medicated against his will, there was testimony that the patient suffered from an incurable mental disease which could, however, be controlled symptomatically with medication. The evidence also showed that in his untreated condition the patient would likely require indefinite confinement in an

institutional setting, but that with proper medication his dangerousness could be decreased to a level that could permit his return to the community. The court ordered the medication and the patient appealed.

The Fourth Circuit recognized that the forcible administration of antipsychotic drugs involved an intrusion upon bodily security which implicated the patient's constitutionally protected liberty interest. This interest, it said, is not absolute but rather "must yield to the legitimate government interests that are incidental to the basis for legal institutionalization, ... and are only afforded protection against arbitrary and capricious government action." 863 F.2d at 305.

The court considered "what procedural protection is constitutionally required to protect the interest in freedom from bodily intrusion that is retained by an involuntarily-committed individual after a prior due process proceeding that significantly curtails his basic liberty interest." *Id.* at 306. Using the *Mathews v. Eldridge, supra,* procedural due process analysis, the court noted that it must decide whether the risk of error identified is adequately guarded against by the process actually used, or whether, taking into account the nature of the risk, the probable value of additional or different protections, the governmental interest at stake, and the fiscal and administrative burdens involved, further or different protections must be required. *Id.* at 307.

The court explained that whether to override a patient's refusal of medication was basically a medical decision. It found that the protections against error were, first, in the competence and integrity of the medical personnel and, second, in the availability of judicial review to guard against arbitrary decisions. It assumed that this procedure adequately protected against erroneous deprivation of the patient's rights; it then assessed the procedure proposed by the patient to determine whether it had such a greater potential for avoiding the risk as would justify further administrative and financial burdens on the government. *Id.* at 309. The court held that the proposed additional

procedures—judicial determination of incompetence before treatment and a "substituted judgment" by the court for incompetent patients—would not significantly reduce the risk of error, and that such procedures would only 1) install the federal courts as baseline providers of procedural due process, collapsing their normal review function into this threshold function; 2) add the expense and delay of judicial proceedings; 3) make medical personnel into expert witnesses rather than baseline decision-makers; and 4) cast district court judges into the role of making primary decisions on purely medical and psychiatric questions, rather than reviewers of such decisions made by qualified professionals. *Id.*

The court continued stating:

"[W]e are not convinced that giving over the determination of this narrow, special dimension of mental competency to non-specialist judges and the adversarial process offers a better protection against error than would leaving it in the first instance to responsible medical professionals, subject to judicial review for arbitrariness. No one contends that the patient's desire is not a factor to be taken into account—if the patient's mental competence to make an informed decision can be assumed....

"... [W]e are satisfied that the patient's competence to make an informed judgment in this matter is properly treated as simply another factor in the ultimate medical decision to administer the medication involuntarily." *Id.* at 311–12.

Also to be weighed in the balance, the court said, was the government interest at stake, and its administrative and fiscal burdens. It observed that "the government's role here is not that of punitive custodian of a fully competent inmate, but benign custodian of one legally committed to it for medical care and treatment—specifically for psychiatric treatment." *Id.* at 312. The court explained that the government was under a statutory duty to attempt to restore mental competency to enable the patient to return to a free society, and that to require a judicial determination

would inhibit the responsible medical personnel from acting expeditiously in furtherance of its treatment efforts.

As to compliance with the due process requirements in deciding to administer antipsychotic drugs to an unwilling, involuntarily committed patient, the court said that the patient was entitled to the exercise of "professional judgment" by those who have the responsibility for making medical decisions that affect the patient's retained liberty interests. *Id.* at 312. This standard, according to the court, dictated the scope of judicial review—"whether the decision was made by an appropriate professional in the exercise of professional judgment, i.e., not arbitrarily." *Id.* at 313. The relevant question, the court reiterated, was whether the decision was "reached by a process so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Id.*

While the Fourth Circuit concluded that the lower court did not err in approving forcible administration of the medication on the basis of the record before it, the court nevertheless remanded the case "to require that before medication is administered the appropriate medical professional reevaluate the situation in light of present conditions and make a new decision before proceeding." *Id.* at 314.

A week after its decision in *Harper*, the Supreme Court removed its earlier stay in *Charters* and denied the petition for certiorari. —— U.S. ——, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

## V.

As earlier observed, Williams was found not criminally responsible for his criminal conduct because of a mental disorder. Under § 12–108 of the Health–General Article, a mental disorder is one that so substantially impairs the mental functioning of an individual "as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another." Upon this verdict, Williams was sent to Perkins

Hospital under § 12–111(a) "for institutional, inpatient care or treatment" for his mental disorder, not to be released if, as a result of his disorder, he continued to be a danger to himself or to the person or property of others. § 12–113. Manifestly, the institution is charged with a statutory duty to treat Williams for his mental disorder to permit him to rejoin society.

Williams was not a convicted felon confined for treatment for mental illness in a medical unit of a penal institution, as in *Harper*. Williams's confinement for treatment purposes in the state psychiatric facility was equally involuntary, however, and was mandated by law as a consequence of his having been found not criminally responsible for his criminal acts. It is clear that the involuntary administration of antipsychotic drugs to Williams, upon approval of the clinical review panel, after consideration of the statutory criteria delineated in § 10–708, is an application of the legislatively adopted public policy of this state.

Section 10–708, like the administrative policy approved in *Harper*, implicitly recognizes that the involuntarily committed inmate has a significant constitutional liberty interest to be free from the *arbitrary* administration of antipsychotic drugs. In this regard, the cited provisions of the Health–General Article evidence the intention of the legislature to create a justifiable expectation that the drugs will not be administered to an inmate unless he is mentally ill and a danger to himself or others.[7] In other words, the Maryland statute limits the authority of the panel to order that such drugs be involuntarily given to Williams for any purpose other than for his mental disorder and only to treat the illness which renders him a danger to himself or others. The extent of Williams's constitutional right to refuse drugs prescribed for this purpose must be determined in the

---

7. Section 10–704 provides that an individual "may not be deprived of the right to vote or to receive, hold, and dispose of property solely because the individual is in a facility ... for a mental disorder." Nothing in this section circumscribes the authority granted by § 10–708 to administer antipsychotic drugs for treatment purposes.

context of his confinement, as stated in *Harper, supra,* 110 S.Ct. at 1037. Thus, unwanted drugs could in no event be administered to a mentally ill inmate involuntarily admitted to a state psychiatric facility, absent compliance with the strict legislative formulation of § 10–708.[8]

As to compliance with procedural due process requirements mandated by *Harper,* § 10–708 does not, on its face, require that the inmate be provided with advance notice of the proceedings before the clinical review panel. Nor does it require that the inmate have the right to be present, to present evidence, to cross-examine witnesses, to have the assistance of an advisor who understands the psychiatric issues involved, and to obtain judicial review of an adverse panel decision before its implementation. It is undisputed on the record in this case that Williams was given but five minutes' notice that the clinical review proceeding would be conducted. Nor was he permitted to be present at the proceeding except to explain his reasons for refusing to take the drugs. Neither he nor his lawyer (who was permitted to attend part of the proceedings on forty-five minutes' notice) was afforded the opportunity to present evidence or cross-examine witnesses. While § 10–708 does not provide a statutory right of judicial review from an adverse panel determination, this shortcoming *of itself* would not render the statute unconstitutional since, under Maryland common law, the courts may always review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable. *See Silverman v. MDIF,* 317 Md. 306, 324, 563 A.2d 402 (1989); *Board v. Gould,* 273 Md. 486, 500–01, 331 A.2d 55 (1975).

In light of *Harper,* we conclude that § 10–708, on its face and as applied in this case, did not afford the requisite procedural due process protections to which Williams was

---

**8.** Nothing in § 10–708 requires that the inmate be adjudged incompetent before drugs may be involuntarily administered to him. The fact that the inmate has been involuntarily institutionalized in a psychiatric facility is not tantamount to a finding that he is mentally incompetent to make treatment decisions.

entitled. Consequently, on this ground alone, without consideration of Williams's other claims, it was error for the trial court to enter summary judgment against Williams. It should have granted Williams's motion for partial summary judgment on the ground that § 10–708 violated procedural due process protections guaranteed by both the State and Federal Constitutions. Accordingly, because § 10–708, in its present form, cannot be enforced against Williams without his consent, the common law principles set forth in *Sard v. Hardy, supra,* 281 Md. at 439, 379 A.2d 1014, are controlling. Those principles prohibit the non-consensual administration of drugs to a mentally competent adult under non-emergency circumstances.[9]

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.

---

9. A number of cases in other jurisdictions have considered the constitutional implications of forcibly medicating involuntarily committed mentally ill individuals. They involve interpretations of varying statutes, and of state constitutional provisions, as well as common law rules, and are therefore of little guidance in determining the constitutionality of the Maryland statutes. *See, e.g., Riese v. St. Mary's Hospital and Medical Center,* 209 Cal.App.3d 1303, 243 Cal.Rptr. 241, *rev. granted,* 245 Cal.Rptr. 627, 751 P.2d 893 (1988); *Matter of Orr,* 176 Ill.App.3d 498, 125 Ill.Dec. 885, 531 N.E.2d 64 (1988); *In re Mental Commitment of M.P.,* 510 N.E.2d 645 (Ind.1987); *Rogers v. Com'r of Dept. of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983); *Jarvis v. Levine,* 418 N.W.2d 139 (Minn.1988); *Opinion of the Justices,* 123 N.H. 554, 465 A.2d 484 (1983); *Rivers v. Katz,* 67 N.Y.2d 485, 495 N.E.2d 337, 504 N.Y.S.2d 74 (1986); *Matter of K.K.B.,* 609 P.2d 747 (Okl.1980).